**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHARITA D. CHALMERS,
Plaintiff-Appellant,

v.                                                              No. 95-2594

TULON COMPANY OF RICHMOND,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-94-868-R)

Argued: July 10, 1996

Decided: December 4, 1996

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the majority opin-
ion, in which Judge Michael joined. Judge Niemeyer wrote a dissent-
ing opinion.

_____

**COUNSEL**

**ARGUED:** Richard J. Keshian, William E. Wright, PETREE
STOCKTON, Winston-Salem, North Carolina, for Appellant. David
E. Nagle, LECLAIR RYAN, Richmond, Virginia, for Appellee. **ON
BRIEF:** Dean L. Whitford, THE RUTHERFORD INSTITUTE,
Charlottesville, Virginia; John Fairfax Pyle, Amherst, Virginia, for
Appellant. Kevin D. Holden, LECLAIR RYAN, Richmond, Virginia,
for Appellee.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Charita Chalmers contends that the district court erred in granting summary judgment to her employer, Tulon Co. ("Tulon"), on her claim that Tulon failed to accommodate her religious conduct. Because Chalmers provided Tulon with no notice of her need to engage in this conduct and because, in any event, this conduct was not susceptible to accommodation, we affirm.

I.

The parties do not dispute the material facts. In stating the facts here, we draw most of them from Chalmers' complaint, J.A. 4-9, and deposition testimony, J.A. 50-90 and 98-107. Only when Chalmers did not testify to a fact do we rely on other sworn testimony.[1]

Chalmers worked for Tulon from October 1988 until September 21, 1993. J.A. 5. Tulon's business involves the manufacturing of drill bits and routers used in the printed circuit board industry. J.A. 42. Tulon maintains a number of service centers throughout the United States, including a center in Richmond, Virginia where Chalmers worked. Id. During Chalmers' years at Tulon, the Richmond center employed from six to fifteen employees. J.A. 52-53, 56-57.

Chalmers began her employment as a repoint operator, J.A. 5, 53, and, after three years, was promoted to supervisor. J.A. 5, 55, 62. During her employment with Tulon, although Chalmers had some issues with her job training, she believed Tulon treated her fairly with

_____

[1] In view of the lack of any dispute as to the material facts, and our careful reliance on the record and particularly on Chalmers' own testimony, we are puzzled by our dissenting colleague's assertion that we "repeatedly and unfairly cast Chalmers' religious activity in the worst possible light, failing to take the facts in the light most favorable to her." Dissent at 17. We have accurately set forth the facts in the record, including joint appendix references for each fact; we note the dissent does not cite any joint appendix references for the facts we "unfairly" fail to take into account.

2

respect to compensation, benefits, and job assignments. J.A. 54-55, 57-59. Prior to her discharge, Chalmers never felt anyone at the company discriminated against her, J.A. 55, 58, or harassed her because of her religious beliefs or practices. J.A. 65.

As repoint supervisor, Chalmers was the only management-level employee working regularly at the Richmond center. J.A. 43. Chalmers' immediate supervisor, Richard C. LaMantia, was in charge of sales throughout the eastern part of the United States but, according to Chalmers, visited Richmond only a few days every few months. J.A. 51-52. At all other times, Chalmers was responsible for the operation of the Richmond center. J.A. 43. Chalmers recognized that it was part of her supervisory responsibility to promote harmony in the workplace and set an example for her subordinates. J.A. 64.

Chalmers has been a Baptist all of her life, and in June 1984 became an evangelical Christian. J.A. 50. At that time, she accepted Christ as her personal savior and determined to go forth and do work for him. Id. As an evangelical Christian, Chalmers believes she should share the gospel and looks for opportunities to do so. J.A. 105.

Chalmers felt that LaMantia respected her, generally refraining from using profanity around her, while around other employees who did not care, "he would say whatever he wanted to say." J.A. 65. LaMantia had taken Chalmers and her husband to dinner once and she felt that she and LaMantia had a "personal relationship" and that she could talk to him. J.A. 71. Chalmers stated that "in the past we have talked about God." Id. Chalmers further testified that "starting off" she and LaMantia had discussed religion about "everytime he came to the service center . . . . maybe every three months" but "then, towards the end maybe not as frequently." J.A. 107. LaMantia never discouraged these conversations, expressed discomfort with them, or indicated that they were improper. J.A. 107. In one of these conversations, LaMantia told Chalmers that three people had approached him about accepting Christ. J.A. 72.

Two or three years after this conversation, id. , Chalmers "knew it was time for [LaMantia] to accept God." J.A. 66. She believed LaMantia had told customers information about the turnaround time for a job when he knew that information was not true. J.A. 66; J.A.

3

70. Chalmers testified that she was "led by the Lord" to write LaMantia and tell him "there were things he needed to get right with God, and that was one thing that . . . he needed to get right with him." J.A. 66-67.

Accordingly, on Labor Day, September 6, 1993, J.A. 84, Chalmers mailed the following letter to LaMantia at his home:

> Dear Rich,
>
> The reason I'm writing you is because the Lord wanted me to share somethings [sic] with you. After reading this letter you do not have to give me a call, but talk to God about everything.
>
> One thing the Lord wants you to do is get your life right with him. The bible says in Roman 10:9vs that if you confess with your mouth the Lord <u>Jesus</u> and believe in your heart that God hath raised him from the dead, thou shalt be saved. vs 10 - For with the heart man believeth unto righteousness, and with the mouth confession is made unto salvation. The two verse are [sic] saying for you to get right with God <u>now</u>.
>
> The last thing is, you are doing somethings[sic] in your life that God is not please [sic] with and He wants you to stop. All you have to do is go to God and ask for forgiveness before it's too late.
>
> I wrote this letter at home so if you have a problem with it you can't relate it to work.
>
> I have to answer to God just like you do, so that's why I wrote you this letter. Please take heed before it's too late.
>
> In his name,
>
> Charita Chalmers

J.A. 67-68; 91-92.

Chalmers was unaware of any other Tulon employees who sent to co-workers at their homes letters regarding religious beliefs, or, indeed, any mail, other than Christmas, birthday, or congratulatory cards. J.A. 80. Chalmers acknowledged that LaMantia had never said or done anything that signaled to her that he consented to a letter like this. J.A. 71. When asked whether she knew "what Rich LaMantia's religious beliefs are," Chalmers responded that she knew "he believe[d] in God, that's about it." J.A. 74. She did not know his religious affiliation or whether he attended church regularly. J.A. 73-74. Nevertheless, Chalmers felt that she could write the above letter to LaMantia at his home because of their "personal relationship" and their conversation two or three years earlier concerning people approaching LaMantia about accepting Christ. J.A. 66, 71, 72.

On September 10, 1993 when Chalmers' letter arrived at LaMantia's home, he was out of town on Tulon business and his wife opened and read the letter in his absence. J.A. 43, 69. Mrs. LaMantia became distraught, interpreting the references to her husband's improper conduct as indicating that he was committing adultery. J.A. 69-70. In tears, she called Chalmers and asked her if LaMantia was having an affair with someone in the New Hampshire area where LaMantia supervised another Tulon facility. Id. Mrs. LaMantia explained that three years before she and LaMantia had separated because of his infidelity. Id. Chalmers told Mrs. LaMantia that she did not know about any affair because she was in the Richmond area. Id. When Mrs. LaMantia asked her what she had meant by writing that there was something in LaMantia's life that "he needed to get right with God," Chalmers explained about the turnaround time problem. J.A. 70. Mrs. LaMantia responded that she would take the letter and rip it up so LaMantia could not read it. Id. Chalmers answered, "Please don't do that, the Lord led me to send this to Rich, so let him read it." J.A. 70-71. The telephone conversation then ended. Id.

Mrs. LaMantia promptly telephoned her husband, interrupting a Tulon business presentation, to accuse him of infidelity. J.A. 43. LaMantia, in turn, called the Richmond office and asked to speak with Chalmers; she was in back and by the time she reached the telephone, LaMantia had hung up. J.A. 99. Chalmers then telephoned the LaMantias' home and, when she failed to reach anyone, left a message on the answering machine that she was sorry"if the letter

5

offended" LaMantia or his wife and that she "did not mean to offend him or make him upset about the letter." J.A. 100.

LaMantia also telephoned Craig A. Faber, Vice President of Administration at Tulon. J.A. 43. LaMantia told Faber that the letter had caused him personal anguish and placed a serious strain on his marriage. Id. LaMantia informed Faber that he felt he could no longer work with Chalmers. Id. LaMantia recommended that Tulon management terminate Chalmers' employment. Id. At her deposition, Chalmers was asked what reaction she would have if one of the employees who worked for her telephoned her husband and told him she was committing adultery. J.A. 83. Chalmers pointed out that she had not telephoned anyone and had not written a letter stating that LaMantia was committing adultery, but she acknowledged that if another employee did telephone her husband with this information, it probably would affect her relationship with that co-worker. Id.

While investigating LaMantia's complaint, Faber discovered that Chalmers had sent a second letter, on the same day as she had sent the letter to LaMantia, to another Tulon employee. J.A. 43 and 49. That employee, Brenda Combs, worked as a repoint operator in the Richmond office and Chalmers was her direct supervisor. J.A. 53, 56-57. Chalmers knew that Combs was convalescing at her home, suffering from an undiagnosed illness after giving birth out of wedlock. J.A. 78. Chalmers sent Combs the following letter:

> Brenda,
>
> You probably do not want to hear this at this time, but you need the Lord Jesus in your life right now.
>
> One thing about God, He doesn't like when people commit adultery. You know what you did is wrong, so now you need to go to God and ask for forgiveness.
>
> Let me explain something about God. He's a God of Love and a God of Wrath. When people sin against Him, He will allow things to happen to them or their family until they open their eyes and except [sic] Him. God can put a sickness

6

on you that no doctor could ever find out what it is. I'm not saying this is what happened to you, all I'm saying is get right with God right now. Romans 10:9;10vs says that is [sic] you confess with your mouth the Lord Jesus and believe in your heart that God has raised him from the dead thou shalt be saved. For with the heart man believeth unto righteousness; and with the mouth confession is made unto salvation. All I'm saying you need to invite God into your heart and live a life for him and things in your life will get better.

 That's not saying you are not going to have problems but it's saying you have someone to go to.

 Please take this letter in love and be obedient to God.

 In his name,

Charita Chalmers

J.A. 78-79; 93-94.

Upon receiving the letter Combs wept. J.A. 44. Faber discussed the letter with Combs who told him that she had been"crushed by the tone of the letter." Id. Combs believed that Chalmers implied that "an immoral lifestyle" had caused her illness and found Chalmers' letter "cruel." Id. Combs, in a later, unsworn statement, asserted that although the letter "upset her" it did not"offend" her or "damage her working relationship" with Chalmers. J.A. 96. **2**

_____

**2** Faber, in another unsworn statement, which he submitted to the EEOC, and made an exhibit to his affidavit in this case, asserted that when he asked Combs "how her working relationship with Chalmers was after having received the letter and having returned to work," Combs "said that it was awkward but felt that she had no other choice but to `work through' the situation as Charita was her boss." J.A. 49. We include this for informational purposes only. It does not appear to have figured in the district court's grant of summary judgment and does not figure in our affirmance.

Faber consulted with other members of upper management and concluded that the letters caused a negative impact on working relationships, disrupted the workplace, and inappropriately invaded employee privacy. J.A. 44. On behalf of Tulon, Faber then sent Chalmers a memorandum, informing her that she was terminated from her position. Id. The memorandum stated in relevant part:

> We have decided to terminate your employment with Tulon Co. effective today, September 21, 1993. Our decision is based on a serious error in judgment you made in sending letters to Rich LaMantia and Brenda Combs, which criticized their personal lives and beliefs. The letters offended them, invaded their privacy, and damaged your work relationships, making it too difficult for you to continue to work here.

> We expect all of our employees to show good judgment, especially those in supervisory positions, such as yours. We would hope you can learn from this experience and avoid similar mistakes in the future.

J.A. 46.

Chalmers had apologized to LaMantia for any distress the letter caused. J.A. 100. Chalmers believed that except for the fact that LaMantia did not want to discuss the letter with her, neither he nor Combs changed their conduct toward her after receipt of the letters. J.A. 104. Richmond center employees blamed Combs for Chalmers' termination. J.A. 102-103. Although Combs disclaimed any damage to her working relationship with Chalmers as a result of the letter, Tulon's termination decision remained firm. J.A. 96.

As a result of the preceding events, Chalmers filed suit, alleging that Tulon discriminated against her based on her religion, in violation of Title VII. J.A. 4-14. She contended that her letter writing constituted protected religious activity that Tulon, by law, should have accommodated with a lesser punishment than discharge. J.A. 7.

II.

Title VII makes it "an unlawful practice for an employer . . . to discharge any individual . . . because of such individual's religion." 42

8

U.S.C. § 2000e-2. Courts have recognized that employees may utilize two theories in asserting religious discrimination claims. See, e.g., Mann v. Frank, 7 F.3d 1365, 1368-70 (8th Cir. 1993) (analyzing discrimination suit as involving two separate theories). These theories are denominated as the "disparate treatment" and "failure to accommodate" theories. Id.

To prove a claim under the disparate treatment theory, an employee must demonstrate that the employer treated her differently than other employees because of her religious beliefs. The evidentiary burdens placed on the employee under this theory mirror those placed on employees alleging employment discrimination based on race or sex. Accordingly, a plaintiff-employee, alleging disparate treatment with respect to her discharge, satisfies her burden at the summary judgment stage if she establishes that her job performance was satisfactory and provides "direct or indirect evidence whose cumulative probative force supports a reasonable inference that [the] discharge was discriminatory." See Lawrence v. Mars, Inc., 955 F.2d 902, 905-06 (4th Cir.), cert. denied, 506 U.S. 823 (1992).

If the employee cannot provide direct evidence, she can utilize a burden-shifting scheme similar to the one the Supreme Court articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to develop an inferential case. Lawrence, 955 F.2d at 905-06. This might consist of evidence that the employer treated the employee more harshly than other employees of a different religion, or no religion, who had engaged in similar conduct. See Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir.), cert. denied, 472 U.S. 1021 (1985). If the employee presents such evidence, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions towards the employee. Id. at 1105. The employee is then required to show that the employer's proffered reason is pretextual, and that the employer's conduct towards her was actually motivated by illegal considerations. At all times, the ultimate burden of persuasion lies with the employee. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Although Title VII similarly classifies religion, sex, and race as illegal considerations, the definition of "religion" in the statute places it in a special category. "Religion" is defined to include "all aspects

9

of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Because this definition includes a requirement that an employer "accommodate" an employee's religious expression, an employee is not limited to the disparate treatment theory to establish a discrimination claim. An employee can also bring suit based on the theory that the employer discriminated against her by failing to accommodate her religious conduct. See Trans World Airlines, Inc. v. Hardison, 432 U.S. 63 (1977).

In a religious accommodation case, an employee can establish a claim even though she cannot show that other (unprotected) employees were treated more favorably or cannot rebut an employer's legitimate, non-discriminatory reason for her discharge. This is because an employer must, to an extent, actively attempt to accommodate an employee's religious expression or conduct even if, absent the religious motivation, the employee's conduct would supply a legitimate ground for discharge.

For example, an employee who is terminated for refusing to work on Sundays can maintain an accommodation claim even if other non-religious employees were also fired for refusing Sunday work, and even though the employer's proffered reason for the discharge -- the refusal to perform required Sunday work -- is legitimate and non-discriminatory (because the Sunday work rule applies to all employees, regardless of religion). If the employee has notified the employer of his religious need to take Sundays off, the burden rests on the employer to show that it could not accommodate the employee's religious practice without undue hardship. See EEOC v. Ithaca Indus., Inc., 849 F.2d 116, 118 (4th Cir.) (en banc) (definition of religion under Title VII requires employers to make reasonable accommodations, short of undue hardship), cert. denied , 488 U.S. 924 (1988).

The district court did not fully elaborate on the basis for its dismissal of Chalmers' claim. The court did state that Chalmers had failed to establish a prima facie case, and that, even if she had, Tulon had offered a legitimate non-discriminatory reason for her discharge.

10

In this appeal, Chalmers does not appear to challenge the district court's rationale for dismissing her claim under the disparate treatment theory, nor could she. Tulon's proffered reasons for discharging Chalmers -- because her letters, which criticized her fellow employees' personal lives and beliefs, invaded the employees' privacy, offended them and damaged her working relationships-- are legitimate and non-discriminatory. Examination of the letters indicates that Chalmers knew that her conduct might distress her co-workers (e.g., her statement in the letter to Combs -- "You probably do not want to hear this"). Additionally, the damage to her working relationship with LaMantia, arising from the marital discord her letter caused, is attributable to Chalmers whether or not it was intended or foreseeable (had she not invaded LaMantia's privacy by sending the letter to his home and included vague references to immoral conduct, Mrs. LaMantia would not have been upset).

Chalmers' primary argument is not that the district court erred in its analysis of her claim under the disparate treatment theory, but that the court erred in failing to analyze her suit under the accommodation theory. In other words, she apparently maintains that even if her letters provided Tulon with a legitimate reason for her discharge, her religious motive for writing the letters required Tulon to accommodate her conduct. Accordingly, we turn to the question of whether Chalmers' complaint survives summary judgment under the accommodation theory.

III.

We have never articulated a framework for analyzing religious accommodation claims. Several of our sister circuits, however, have developed such a framework, which we now adopt.

To establish a prima facie religious accommodation claim, a plaintiff must establish that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement." Philbrook v. Ansonia Bd. of Educ., 757 F.2d 476, 481 (2d Cir. 1985) (quoting Turpen v. Missouri-Kansas-Texas R.R. Co., 736 F.2d 1022, 1026 (5th Cir. 1984)), aff'd on other grounds , 479 U.S. 60, 65 (1986).

11

If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not accommodate the plaintiff's religious needs without undue hardship. Id.; see also EEOC v. Arlington Transit Mix, Inc., 957 F.2d 219, 221-22 (6th Cir. 1991); Beasley v. Health Care Serv. Corp., 940 F.2d 1085, 1088 (7th Cir. 1991); EEOC v. Hacienda Hotel, 881 F.2d 1504, 1512 (9th Cir. 1989); Jenkins v. Louisiana, 874 F.2d 992, 995 (5th Cir. 1989), cert. denied, 493 U.S. 1059 (1990); Protos v. Volkswagen of America, Inc., 797 F.2d 129, 133 (3d Cir.), cert. denied, 479 U.S. 972 (1986).

Chalmers has alleged that she holds bona fide religious beliefs that caused her to write the letters. Tulon offers no evidence to the contrary. The parties agree that Tulon fired Chalmers because she wrote the letters. Accordingly, Chalmers has satisfied the first and third elements of the prima facie test. However, in other equally important respects, Chalmers' accommodation claim fails.

A.

Chalmers cannot satisfy the second element of the prima facie test. She has forecast no evidence that she notified Tulon that her religious beliefs required her to send personal, disturbing letters to her co-workers. Therefore she did not allow the company any sort of opportunity to attempt reasonable accommodation of her beliefs.

As Chalmers recognizes, a prima facie case under the accommodation theory requires evidence that she informed her employer that her religious needs conflicted with an employment requirement and asked the employer to accommodate her religious needs. See Redmond v. GAF Corp., 574 F.2d 897, 901 (7th Cir. 1978) (prima facie standard includes a "requirement that plaintiff inform his employer of both his religious needs and his need for an accommodation"); Cary v. Carmichael, 908 F. Supp. 1334, 1343-46 (E.D. Va. 1995). Compare Ithaca, 849 F.2d at 118 (if an employee requests to observe the Sabbath, the employer must attempt to accommodate) with EEOC v. J.P. Stevens & Co., 740 F. Supp. 1135, 1137 (E.D. N.C. 1990) (employer may fire an employee who failed to provide advance notice of his religious beliefs regarding the Sabbath).

Chalmers concedes that she did not expressly notify Tulon that her religion required her to write letters like those at issue here to her co-

12

workers, or request that Tulon accommodate her conduct. Nonetheless, for several reasons, she contends that such notice was unnecessary in this case.

Initially, Chalmers asserts that Tulon never explicitly informed her of a company policy against writing religious letters to fellow employees at their homes and so she had "no reason to request an accommodation." Reply Brief at 12. However, companies cannot be expected to notify employees explicitly of all types of conduct that might annoy co-workers, damage working relationships, and thereby provide grounds for discharge. As noted previously, Chalmers implicitly acknowledged in the letters themselves that they might distress her co-workers. Moreover, she conceded that, as a supervisor, she had a responsibility to "promote harmony in the workplace."

Although a rule justifying discharge of an employee because she has disturbed co-workers requires careful application in the religious discrimination context (many religious practices might be perceived as "disturbing" to others), Chalmers, particularly as a supervisor, is expected to know that sending personal, distressing letters to co-workers' homes, criticizing them for assertedly ungodly, shameful conduct, would violate employment policy. Accordingly, the failure of the company to expressly forbid supervisors from disturbing other employees in this way, provides Chalmers with no basis for failing to notify Tulon that her religious beliefs required her to write such letters.

Alternatively, Chalmers contends that the notoriety of her religious beliefs within the company put it on notice of her need to send these letters. In her view, Chalmers satisfied the notice requirement because Tulon required "only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements." Brown v. Polk County , 61 F.3d 650, 654 (8th Cir. 1995) (en banc) (quoting Heller v. EBB Auto Co., 8 F.3d 1433, 1439 (9th Cir. 1993)).

Knowledge that an employee has strong religious beliefs does not place an employer on notice that she might engage in any religious activity, no matter how unusual. Chalmers concedes that she did not

13

know of any other employee who had ever written distressing or judgmental letters to co-workers before, and that nothing her co-workers had said or done indicated that such letters were acceptable. Accordingly, any knowledge Tulon may have possessed regarding Chalmers' beliefs could not reasonably have put it on notice that she would write and send accusatory letters to co-workers' homes. Cf. Brown, 61 F.3d at 654 (holding that because the employee had engaged in similar religious conduct on prior occasions, employer had notice of the conflict).[3]

Chalmers also contends that the letters themselves provided notice that her religious beliefs compelled her to write them. But giving notice to co-workers at the same time as an employee violates employment requirements is insufficient to provide adequate notice to the employer and to shield the employee's conduct. See Johnson v. Angelica Uniform Group, Inc., 762 F.2d 671 (8th Cir. 1985) (plaintiff failed to provide adequate notice to establish prima facie case where she left a note to her employer immediately before she went away for several days, informing the employer that she would need to exceed her allotted leave time for religious reasons).

In a similar vein, Chalmers appears to contend that because Tulon was necessarily aware of the religious nature of the letters after her co-workers received them and before her discharge, Tulon should have attempted to accommodate her by giving her a sanction less than a discharge, such as a warning. This raises a false issue. There is nothing in Title VII that requires employers to give lesser punishments to employees who claim, after they violate company rules (or at the same time), that their religion caused them to transgress the rules. See Johnson, 762 F.2d at 673 (employer need not establish that it attempted accommodation when plaintiff failed to provide adequate notice to the employer before violating employment rules, even

_____

[3] We emphasize that we do not hold, as the dissent suggests at 23-25, that an employer's knowledge of an employee's sincere religious beliefs can never not put an employer on notice of the possibility of some religious conduct by an employee at work, e.g. display of ashes on Ash Wednesday or wearing a yarmulke, etc. We simply hold that in this case the knowledge that Tulon had of Chalmers' religious beliefs did not put it on notice that she would write, and send, personal, accusatory letters to co-workers at their homes.

14

though the employer knew of the religious motive for employee's violation prior to discharge).

Part of the reason for the advance notice requirement is to allow the company to avoid or limit any "injury" an employee's religious conduct may cause. Additionally, the refusal even to attempt to accommodate an employee's religious requests, prior to the employee's violation of employment rules and sanction, provides some indication, however slight, of improper motive on the employer's part. The proper issue, therefore, is whether Chalmers made Tulon aware, prior to her letter writing, that her religious beliefs would cause her to send the letters. Since it is clear that she did not, her claims fail. See J.P. Stevens, 740 F. Supp. at 1137.

In sum, Chalmers has not pointed to any evidence that she gave Tulon -- either directly or indirectly -- advance notice of her need for accommodation. For this reason, Chalmers has failed to establish a prima facie case of discrimination under the religious accommodation theory.

B.

If we had concluded that Chalmers had established a prima facie case, Chalmers' religious accommodation claim would nonetheless fail. This is so because Chalmers' conduct is not the type that an employer can possibly accommodate, even with notice.

Chalmers concedes in the letters themselves that she knew the letters to her co-workers, accusing them of immoral conduct (in the letter to Combs, suggesting that Combs' immoral conduct caused her illness), might cause them distress. Even if Chalmers had notified Tulon expressly that her religious beliefs required her to write such letters, i.e. that she was "led by the Lord" to write them, J.A. 66, Tulon was without power under any circumstance to accommodate Chalmers' need.

Typically, religious accommodation suits involve religious conduct, such as observing the Sabbath, wearing religious garb, etc., that result in indirect and minimal burdens, if any, on other employees. Cf.

15

<u>Wilson v. US West Communications</u>, 58 F.3d 1337, 1342 (8th Cir. 1995) (accommodation required when employee wore a religious button that bothered co-workers indirectly). An employer can often accommodate such needs without inconveniencing or unduly burdening other employees.

In a case like the one at hand, however, where an employee contends that she has a religious need to impose personally and directly on fellow employees, invading their privacy and criticizing their personal lives, the employer is placed between a rock and a hard place. If Tulon had the power to authorize Chalmers to write such letters, and if Tulon had granted Chalmers' request to write the letters, the company would subject itself to possible suits from Combs and LaMantia claiming that Chalmers' conduct violated <u>their</u> religious freedoms or constituted religious harassment. Chalmers' supervisory position at the Richmond office heightens the possibility that Tulon (through Chalmers) would appear to be imposing religious beliefs on employees. <u>Cf. Wilson</u>, 58 F.3d at 1342 ("Title VII does not require an employer to allow an employee to impose . . . religious views on others").

Thus, even if Chalmers had notified Tulon that her religion required her to send the letters at issue here to her co-workers, Tulon would have been unable to accommodate that conduct.

IV.

We do not in any way question the sincerity of Chalmers' religious beliefs or practices. However, it is undisputed that Chalmers failed to notify Tulon that her religious beliefs led her to send personal, disturbing letters to her fellow employees accusing them of immorality. It is also undisputed that the effect of a letter on one of the recipients, LaMantia's wife, whether intended or not, caused a co-worker, LaMantia, great stress and caused him to complain that he could no longer work with Chalmers. Finally, it is undisputed that another employee, Combs, told a company officer that Chalmers' letter upset her (although she later claimed that her working relationship with Chalmers was unaffected). Under these facts, Chalmers cannot establish a religious accommodation claim. Accordingly, the district court's order granting summary judgment to Tulon is

<u>AFFIRMED</u>.

16

NIEMEYER, Circuit Judge, dissenting:

Charita Chalmers was a star employee of Tulon Company, and Tulon had rapidly promoted her to the top management position in its Richmond office. There is no suggestion in the record that she did not perform her job well, that she was ever disciplined before the incident in this case, or that Tulon's Richmond office did not function successfully. Nevertheless, Chalmers was fired without warning after she sent a proselytizing letter to her supervisor as a continuation of their earlier religious discussions. The letter, written because of Chalmers' unease with her supervisor's business practices, urged her supervisor "to get right with God" by repenting. While the letter stated that the supervisor was doing "some things" that were not pleasing to God, it made no specific accusations. Chalmers sent the letter to her supervisor's home, explaining, "I wrote this letter at home so if you have a problem with it you can't relate it to work." She also wrote that she expected no response and that any response should be made to God.

After Chalmers' supervisor made the request to his superior that Chalmers be fired, Tulon discovered that Chalmers had written a similar letter to a fellow employee. Accordingly, Tulon included the writing of both letters as its reason for terminating Chalmers. The letters violated no company policy, practice, or instruction, express or implied.

In affirming dismissal of Chalmers' religious discrimination claim on review of summary judgment, the majority has repeatedly and unfairly cast Chalmers' religious activity in the worst possible light, failing to take the facts in the light most favorable to her. This approach is not only unnecessarily hostile to Chalmers' religious practice, it violates our standard for reviewing summary judgments by taking facts in the light most favorable to the non-moving party. See, e.g., Evans v. Technologies Applications and Service Co., 80 F.3d 954, 958 (4th Cir. 1996) (requiring that facts be viewed in the light most favorable to non-moving party). Not only must we take facts in the light most favorable to the non-moving party, but we must also draw all legitimate inferences in the non-moving party's favor. Evans, 80 F.3d at 958. The majority opinion turns our standard of review on its head, indulging all of Tulon's characterizations of the facts, ignor-

17

ing every inference in support of Chalmers, and finding that there is no factual support for Chalmers' claim.

For example, instead of treating the letter that Chalmers sent to her supervisor in a light most favorable to her, the majority accepts Tulon's characterizations and refers to the letter variously as disturbing, annoying, judgmental, accusatory, and critical. The majority also accepts the disputed claim that the letter disturbed Tulon's workplace and rejected Chalmers' claim that it was sent as sensitive, caring advice, making no accusations and demanding no response. And it is this single letter -- the characterization and effect of which is so disputed -- that indisputably led LaMantia to ask that Chalmers be fired.

Moreover, after taking the facts in a light hostile to Chalmers, the majority subjects those facts to a legal standard inconsistent with the language of Title VII. The majority imposes on Chalmers, as a condition to recovery, the requirement not imposed by statute to notify her employer in advance of her intent to send the letters in question and of their significance to her religion. Furthermore, it imposes on Chalmers the burden of proving that her religious practice could be accommodated by her employer, reversing the burden statutorily assigned to the employer that the practice could not reasonably be accommodated.

Because I would find that the facts taken in a light most favorable to Chalmers make out a prima facie case under Title VII for religious discrimination and that Tulon has not, as a matter of law, demonstrated undue hardship in accommodating Chalmers' religion, I would remand this case for trial. Therefore, I dissent.

I

The record before the district court, taken in the light most favorable to Chalmers, demonstrates the following facts.

Chalmers has been a Baptist all her life, and in June 1984, she became an evangelical Christian, accepting Jesus Christ as her personal savior. Since then, she has tried to influence others to accept Jesus and partake of salvation. In accord with her belief that she

18

should share the gospel, Chalmers openly speaks with others about religion and their spiritual health. She believes that she should look for opportunities to share the gospel with others, especially when others initiate religious conversations.

Chalmers began work for Tulon in October 1988 and, because of her superior job performance, was made supervisor in 1991. As supervisor, she was the only management-level employee in Tulon's Richmond plant. Chalmers reported to Richard LaMantia, who managed plants throughout the eastern United States and visited Richmond a few days each month.

LaMantia knew that Chalmers was a deeply religious woman and, prior to the incident giving rise to her termination, appeared to respect her for it. For instance, when in Chalmers' presence, LaMantia generally refrained from using profanity, whereas around others who did not care, "he would say whatever he wanted to say." Chalmers and LaMantia had many religious discussions, often initiated by LaMantia. LaMantia confided in Chalmers that three other persons had similarly urged him to accept Jesus Christ. Prior to the time that Chalmers was fired, Chalmers and LaMantia were having religious discussions approximately every three months. LaMantia never discouraged these discussions, never expressed discomfort, and never indicated that it was improper for Chalmers to try to influence others in a religious way.[1]

In the course of their work together in Richmond, it became clear to Chalmers that LaMantia was misrepresenting to customers Tulon's ability to fulfill orders quickly. Chalmers said she was "led by the Lord" to write him because LaMantia's lying was "one of those things he needed to stop doing," "one of the things he needed to get right with God." Chalmers felt that she could write LaMantia about his lying because LaMantia believed in God and she and LaMantia had

_____

[1] In the district court, counsel for Chalmers referred to an affidavit, or perhaps a portion of her deposition, where she also testified that LaMantia had "asked her on several occasions, When are you going to start a Bible study here." J.A. 120. That portion of her deposition, which even suggests LaMantia's encouragement, was not, however, formally attached to Chalmers' response to Tulon's motion for summary judgment.

19

a personal relationship -- Chalmers and LaMantia had shared religious experiences and LaMantia had taken Chalmers and her husband out to dinner. Chalmers did not, however, specifically refer to lying in her letter. Not wanting the letter to affect their relationship at work, Chalmers sent the letter to LaMantia's home and requested no response to it.[2]

When the letter arrived, LaMantia's estranged wife opened it and thought that the portion of the letter referring to"things in [LaMantia's] life that God was not pleased with" in fact referred to adultery. Mrs. LaMantia called Chalmers and asked her whether LaMantia was having an affair with an individual in the New Hampshire area where LaMantia supervised another facility. Mrs. LaMantia explained that she and LaMantia had separated three years earlier because of LaMantia's infidelity and that she now suspected it again. Chalmers told Mrs. LaMantia that she was unaware of any affair and that the letter was not referring to any adulterous conduct. Chalmers stated she was sorry that the letter upset Mrs. LaMantia, assuring Mrs. LaMantia that she was referring only to LaMantia's business practices. Unconvinced of Chalmers' explanation, Mrs. LaMantia called her husband. Because of Mrs. LaMantia's misinterpretation of the letter and refusal to accept Chalmers' explanation, the LaMantias' relationship became further strained. When Chalmers heard that the letter had been misinterpreted and had upset the LaMantias, she called the LaMantias' home and, on reaching no one, left a message on the answering machine that she was sorry and did not mean to offend anyone.

Angered that Chalmers had sent the letter, LaMantia informed Tulon's vice president of administration, Craig Faber, that he could no longer work with Chalmers and requested that Chalmers be fired. LaMantia and Faber agreed that Faber should "handle the termination." Faber conducted a brief investigation without questioning Chalmers and then sent Chalmers a letter of termination.

While investigating the incident, Faber discovered that Chalmers had sent another religious letter to Tulon employee Brenda Combs. Combs had confided in Chalmers that she had been involved in an

_____

[2] The text of the letter is quoted in the majority opinion.

20

adulterous relationship and had recently given birth out of wedlock. Chalmers also knew that Combs had been away from work for months, attempting to recover from an illness that doctors had been unable to diagnose. In her letter to Combs, Chalmers tried to persuade Combs to repent of her sexual misconduct. She explained that when people sin, "[God] will allow things to happen to them or their family until they open their eyes and [accept] Him," and "God can put a sickness on you that no doctor could ever find out what it is." Chalmers added, though, "I'm not saying this is what happened to you."[3] While Combs was upset upon reading the letter, she explained in a statement that she did not find it offensive and, more importantly, that it did not affect her working relationship with Chalmers. Indeed, Combs never complained to anyone at Tulon, and she acknowledged to Tulon management that she received the letter only when Faber independently found out about it and contacted her. During the two-week period after the letters were sent and before Chalmers was fired, there was no adverse change in the Richmond workplace. The only disruption at Tulon's Richmond plant came when employees learned that Chalmers was being fired for sending the letters. "They couldn't believe it."

Even though Combs has stated that the letter to her"did not offend me nor did it damage our working relationship," Faber informed Chalmers that she was being fired because she had made "a serious error in judgment . . . in sending letters to Rich LaMantia and Brenda Combs," which "offended them . . . and damaged[their] work relationship." The parties agree that Tulon fired Chalmers because she wrote the letters, and all agree that the letters addressed religious concerns. Chalmers concluded at the time of her termination, "I was terminated because I had written two letters to Rich and Brenda regarding salvation and God." Similarly, in his May 6, 1994 affidavit, Faber acknowledged that the letters were "religious in nature." Indeed, the very language of the letters unquestionably support that conclusion.

Challenging her termination from employment, Chalmers filed suit under Title VII of the Civil Rights Act of 1964 for religious discrimination and failure to accommodate her religious practices. The district

_____

[3] The text of the letter is quoted in the majority opinion.

21

court entered summary judgment, concluding that Chalmers had not made out a prima facie case and that even if she had, Tulon had articulated a legitimate nondiscriminatory reason for her firing. Without articulating the reason, the court added,

> And the fact that Ms. Chalmers in her zealotry writes disruptive letters in effect accusing people of criminal activity and things of that nature has such an impact on other employees' ability to perform in the work place, that the company would have been derelict in its responsibility if it didn't try to get rid of her and have a less disruptive employee in the lineup.

The district court pointed to no facts in the record to support those conclusions.

From the district court's judgment, Chalmers appealed.

II

The provision of Title VII on which Chalmers bases her claim makes it unlawful for an employer "to discharge any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). "The term `religion' includes all aspects of religious . . . practice . . . unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j) (emphasis added). The legal analysis for a claim under those provisions must therefore address two burdens: Chalmers' burden of showing that she was fired because of a religious practice and Tulon's burden of demonstrating that it could not accommodate the practice without undue hardship.

To satisfy her burden and establish a prima facie case of religious discrimination under Title VII, Chalmers must prove (1) that she engaged in a religious practice, (2) that the employer discharged her or took other adverse employment action against her, and (3) that the employer's action was motivated at least in part by her religious practice. In short, she must show she was discharged"because of" the religious practice.

22

Because Chalmers' conduct in sending proselytizing letters was unquestionably a religious practice and she was discharged, she has indisputably established the first two elements of her case. As for the third element, a factfinder could reasonably conclude that her discharge was motivated by the religious practice of sending proselytizing letters. Tulon advised Chalmers she was being terminated because she sent the two letters, and indeed, the majority appropriately notes that "[t]he parties agree that Tulon fired Chalmers because she wrote the letters." Slip op. at 12. In providing evidence to establish these three statutorily required elements, Chalmers has made out a prima facie case of religious discrimination. Yet the majority would impose a significantly greater burden on Chalmers without explaining how its views are either required or warranted by the statute.

Relying on the Fifth Circuit's decision in Turpen v. Missouri-Kansas-Texas RR Co., 736 F.2d 1022 (5th Cir. 1984), aff'd on other grounds, 479 U.S. 60 (1986), the majority concludes that Chalmers' claim was fatally flawed because she somehow failed to give Tulon notice of her religious beliefs. Obviously, if an employer is to be charged with discrimination against an employee "because of" the employee's religious beliefs or practice, the employer must be aware of the beliefs or practice and understand their religious nature. But the majority errs both legally and factually when it decides that Chalmers' claim must fail because she did not explicitly inform Tulon that she would write religious letters to co-workers.

A

It is legal error to construe Title VII to impose a burden on the employee of informing her employer in advance about each practice the employee will follow in furtherance of religious beliefs. It is undoubtedly true that an employer cannot be held liable for religious discrimination by, for example, assigning an employee to work on Sunday when the employer has no knowledge that work on Sunday violates the employee's religious beliefs. See, e.g., EEOC v. Ithaca Indus., Inc., 849 F.2d 116 (4th Cir. 1988); Redmond v. GAF Corp., 574 F.2d 897 (7th Cir. 1978). But that does not impose an additional religious disclosure burden on Title VII plaintiffs. Instead, it is merely a recognition that Title VII's "because of" requirement cannot be sat-

23

isfied where the employer has no knowledge that the conduct warranting discharge was religious in nature.

The majority has grafted a claim-defeating notice requirement onto the statutory requirements for establishing a prima facie case, concluding as a matter of law, "any knowledge Tulon may have possessed regarding Chalmers' beliefs could not reasonably have put it on notice that she would write and send accusatory letters to co-workers' homes." Slip op. at 14. This notice requirement would preclude liability for every adverse employment action taken because of a religious practice if the employer did not know in advance that the practice would take place, even though the employer recognized the practice as religious in nature. Under that rule an employer would automatically be exonerated from liability when, e.g., it fired an employee who arrived at work on Ash Wednesday with a cross of ashes marked on her forehead, because the employee violated a work rule against face paint. The irrationality of such a rule is readily apparent.

In Brown v. Polk County, 61 F.3d 650 (8th Cir. 1995) (en banc), the Eighth Circuit appropriately avoided such an irrational rule. It noted, "Because the first reprimand related directly to religious activities by Mr. Brown, we agree with the district court that the defendants were well aware of the potential for conflict between their expectations and Mr. Brown's religious activities." Id. at 654 (emphasis added). The court concluded that the employer violated Title VII when it fired Brown (without attempting accommodation) based on the religious activities giving rise to the first reprimand. See id. at 657. Brown thus stands for the precise proposition that the majority rejects: Religious conduct violating employment requirements may be sufficient to put an employer on notice of the need to accommodate the religious practice.

The wisdom of the Eighth Circuit's holding in Brown is demonstrable by understanding the irrational ramifications of the majority's ruling. The majority's rule would mean that as a matter of law a Jew could not make out a prima facie case under Title VII if, on the first day of work, he was fired for wearing a yarmulke that, unknown to him, violated his company's dress code. Similarly, a Muslim would have no case for being fired the first time mandatory company meet-

24

ings conflicted with his prayer schedule; a Jehovah's Witness would have none upon being fired for her disrespect in refusing to attend a company-wide celebration of the CEO's birthday; a Mormon would have none for being fired the first time he refused to work late on church-wide family nights. And, of course, as the majority concludes, an evangelical Baptist's case would fail as a matter of law if she is fired the first time she puts in writing the religious ideas that she has been permitted and encouraged to speak. This is not the law of Title VII. If the employer knows that conduct is religious when it makes the discharge decision "because of" that conduct, the prima facie elements of a religious discrimination claim have been satisfied.

B

Even assuming that the law requires Chalmers to inform Tulon about the practices she might take in furtherance of her beliefs, the majority impermissibly finds facts when it says"any knowledge Tulon may have possessed regarding Chalmers' beliefs could not reasonably have put it on notice that she would write and send accusatory letters to co-workers' homes." Slip op. at 14 (emphasis added). While one might be able to conclude that Tulon had no notice that the LaMantias would experience stress from Chalmers' letter -- a fact irrelevant for assessing Chalmers' prima facie case -- a factfinder would certainly be entitled to view the record and conclude (1) that LaMantia was aware that Chalmers believed she should urge co-workers to accept Jesus Christ and (2) that the letters were a religious practice in furtherance of that belief. Indeed, when viewed in a light most favorable to Chalmers, Chalmers' assertions that she discussed religion repeatedly with LaMantia, that LaMantia talked about his own religious encounters, that he showed Chalmers particular respect in the workplace, and that he never objected or took exception to any religious discussion with Chalmers could support the conclusion that he was encouraging her to continue her practices. The majority seems to conclude, however, that religious conversations are so dissimilar from written letters of identical content that a reasonable factfinder could never find sufficient employer notice of the employee's religious practices. But, if Tulon denies the sufficiency of notice based on LaMantia's experience with Chalmers, then the issue is in dispute and can only be resolved by factfinding.

25

III

Once a plaintiff establishes a prima facie case under Title VII, the burden shifts to the employer to demonstrate that it is "unable to reasonably accommodate to the . . . [religious] practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); Ithaca, 849 F.2d at 118; Redmond, 574 F.2d at 901.

To meet its burden, Tulon must at a minimum demonstrate that Chalmers' practice was inconsistent with the needs of its workplace. Absent some inconsistency, Tulon cannot rely on the practice as a reason for discharging Chalmers. That is, if a religious practice is not in some way inconsistent with a company policy, custom, or requirement (whether explicit or not), permitting the practice cannot unduly burden the conduct of business. Yet Tulon has failed to demonstrate that the letters violated any company policy, custom, or requirement. Indeed, in briefing this case Tulon has pointedly conceded that it "had [no] policy prohibiting . . . the sending of letters (religious or not) to the homes of Tulon employees." Nor has it established beyond dispute that sending the letters in fact disrupted the workplace. Despite the statements of Combs and Chalmers that the workplace was not disrupted, the majority finds the opposite. To conclude, as the majority has, that the employee disrupted the workplace requires several factual findings that are impermissible on review of a summary judgment.

Without Tulon even taking a position that it could not accommodate Chalmers' religious practice, the majority rules also that "Chalmers' conduct is not the type that an employer can possibly accommodate, even with notice." Slip op. at 15. Even if it were within the majority's province to make such a finding, it could not do so on the present record, drawing all legitimate inferences in favor of Chalmers.

The majority assumes that Chalmers' "need" to write evangelical letters is absolute and that she would not stop writing them if asked to do so. This conclusion is drawn from the unsupported belief that Chalmers' "religious beliefs required her to send personal, disturbing letters to her co-workers," slip op. at 12 (emphasis added) and also at 13, or that they "compelled her to write them," slip op. at 14, and that

26

"she has a religious <u>need</u> to impose personally and directly on fellow employees." Slip op. at 16 (emphasis added). **4** These conclusions, however, are not supported by the record. Chalmers stated that she was "<u>led</u> by the Lord" and "<u>inspired</u>" to write LaMantia. To conclude that these statements mean that she could not, consistent with her religious beliefs, accept requests to stop writing may not even be a legitimate inference, much less the only legitimate inference. Certainly, it requires factfinding, which we are not free to do.

The majority's holding that Chalmers' conduct was beyond accommodation is even more remarkable in light of the fact that the statute imposes the burden on the <u>employer</u> to demonstrate that a religious practice <u>cannot</u> be accommodated without undue hardship. The parties have not even been given an opportunity to explore that issue at trial. By ruling that as a matter of law Chalmers' conduct was not susceptible to accommodation, the majority in effect shifts to Title VII plaintiffs the burden of refuting a defense that the defendant neither asserted nor demonstrated.

IV

Whatever we or the district court think about Chalmers' religious practices, it is not our place to preempt a trial of her claim by assuming that all factual disputes will be resolved against her. And we err legally by imposing a statutorily ungrounded prior notice requirement in circumstances where the employer fully appreciates the religious nature of a practice. Finally, we compound that error by shifting to the plaintiff a burden that the statute places on the defendant.

The judgment should be vacated and the case remanded for trial.

_____

**4** In applying Title VII, the majority also appears to distinguish religious <u>beliefs</u> from religious <u>practices</u> . <u>See e.g.</u>, slip op. at 9, 12, 13. Yet, Title VII prohibits discrimination based on an employee's <u>religion</u>, <u>see</u> 42 U.S.C. § 2000e-2(a)(1), defining religion explicitly to include "all aspects of religious . . . practice," <u>see</u> 42 U.S.C. § 2000e(j). Chalmers' letters are unquestionably an aspect of her religious practice, and they were recognized as such.