Sonya MCINTYRE–HANDY, Plaintiff,

v.

**WEST TELEMARKETING CORPORATION,**
Defendant.

No. 4:99CV100.

United States District Court,
E.D. Virginia,
Newport News Division.

May 19, 2000.

Sonya McIntyre–Handy, Hampton, VA, plaintiff pro se.

Burt H. Whitt, Scott W. Kezman, Kaufman & Canoles, P.C., Norfolk, VA, Phyllis Pollard, Derek Gilliland, Scott, Douglass & McConnico, LLP, Austin, TX, for defendant.

## OPINION AND FINAL ORDER

REBECCA BEACH SMITH, District Judge.

This matter comes before the court on defendant's motion for summary judgment. For the reasons articulated below, the court **DENIES** defendant's motion for summary judgment based on plaintiff's failure to exhaust administrative remedies, but **GRANTS** summary judgment in favor of defendant on the merits of plaintiff's claim.

### I. Facts and Procedural History

West Telemarketing Corporation ("West") is a nationwide telemarketing company that employs approximately 1850 employees. West's facility in Hampton, Virginia, is an inbound call facility which handles customer service orders for a variety of products and services, many of which are promoted via television infomercial and print advertisements. The company processes orders for over 1200 clients,

answering between 400,000 and 600,000 phone calls per month. (Pl.Mot. Opp'n Summ.J., Letter of Anaise Schroeder, Director of Human Resources, West TeleServices Hampton, to Sheila Chesson, Norfolk Equal Employment Opportunity Commission 2 (Apr. 2, 1999) [hereinafter Schroeder Letter]).

To ensure that client products and services are accurately described and orders properly taken, West requires its telemarketing representatives to read and follow scripts while processing orders. These scripts are provided to West by its clients, who work with West to choose each script's wording. Clients insist that the scripts be read verbatim. (Vanessa J–Douglas Aff. ¶ 4 [hereinafter J–Douglas Aff.]). To maintain the quality of its services and ensure that its telemarketing representatives are recording orders accurately, West randomly monitors incoming calls as part of its Quality Assurance Program. Telemarketing representatives are aware that they may be monitored and recorded at any time; in fact, employees consent to such monitoring as a condition of employment. (J–Douglas Aff. ¶ 4; Dep. of Sonya McIntyre–Handy at 129–30 & Ex. 8 [hereinafter McIntyre–Handy Dep.]).

Plaintiff, Sonya McIntyre–Handy, began work with West as a telemarketing representative on October 18, 1998. Before her employment began, plaintiff signed a "Statement of Understanding" acknowledging, inter alia, that incoming calls to her station could be monitored with or without her consent, and that she was responsible for reading West's Policy Manual for Telemarketing Representatives. (Def.Mot.Summ.J., App. A, Attach. 8 to Ex. 4, Statement of Understanding ¶¶ 1–2). During the pendency of plaintiff's employment, West operated four separate line groups: the direct line group, the financial services group, the psychic line group, and the customer service group. (Susan Burns Aff. ¶ 3 [hereinafter Burns Aff.]). Before answering any live calls,

plaintiff underwent four days of training. (Burns Aff. ¶ 4). After completing her initial training, plaintiff began work in West's direct line group. (McIntyre–Handy Dep. at 79; J–Douglas Aff. ¶ 6).

The direct line group employs the greatest number of telemarketing representatives who receive calls and place orders for several hundred clients. (Burns Aff. ¶ 3). At least two of these clients—the Creflo Dollar Ministry and the Christian Children's Fund—were religiously-affiliated organizations. Incoming calls randomly reach telemarketing representatives. West can neither control nor predict for which client a telemarketing representative will receive calls. As a result, plaintiff read scripts for these two religiously-affiliated clients when the calls came to her calling station. Plaintiff is an atheist, and considered the calls she answered to conflict with her beliefs because she felt as if she were "selling religion," and furthermore, she objected to having to listen to callers' testimonials. On November 4, 1998, plaintiff submitted a letter to her supervisors notifying them of her discomfort reading scripts for these religiously-affiliated groups. (McIntyre–Handy Dep. at 80–82). Specifically, plaintiff objected to the universal greeting required for all inbound calls, "I am glad you called today for (client / product name)." Plaintiff felt that saying *she* was *glad* "subjected her," or involved her personally, in the transaction and in the beliefs of the religiously-affiliated client. (Def.Mot.Summ.J., App. A, Ex. 1–A, Letter of Sonya McIntyre–Handy to Vanessa J–Douglas, Employee Relations/Training Manager for West TeleServices Hampton 1 (Nov. 4, 1998) [hereinafter McIntyre–Handy Letter]).

The following day, November 5, 1998, Vanessa J–Douglas, Employee Relations / Training Manager for West, and Susan Burns, Employment Manager for West, met with plaintiff to address the concerns raised in her letter. (J–Douglas Aff. ¶ 8; Burns Aff. ¶ 5; McIntyre–Handy Dep. at 82–83). In the letter, plaintiff had re-

quested either that she be allowed to alter the script or be transferred to another line group. (McIntyre–Handy Dep. at 81–82; McIntyre–Handy Letter at 2). Although plaintiff's complaints related to only a few of West's hundreds of clients, and although Ms. J–Douglas did not believe that the mere statement "I am glad you called" prefacing a religiously-affiliated client's name created a religious burden, Ms. J–Douglas and Ms. Burns agreed to transfer plaintiff from the direct line group. (J–Douglas Aff. ¶ 8). At the time of plaintiff's request for accommodation, the psychic line group was the only group not fully staffed. (Burns Aff. ¶ 5). As a result, plaintiff was transferred into the psychic line group, thereby receiving a pay increase of $0.75 per hour. (J–Douglas Aff. ¶ 8; Burns Aff. ¶ 3). The psychic line group receives calls for only one client— the Psychic Readers Network. Plaintiff began a three-day training program for that group on November 10, 1998, five days after her meeting with her supervisors.

All new employees are considered to be on probation during the first three months of their employment. (Def.Mot.Summ.J., App. A, Attach. 9 to Ex. 4, West's Policy Manual for Telemarketing Representatives at 34 [hereinafter West's Policy Manual] ). The purpose of the probationary period "is to give both the employee and the Company an opportunity to determine their interest and suitability for continued employment." (West's Policy Manual at 34). During this period, the employee's performance, behavior, and attendance are carefully monitored. At any time during the three-month probationary period, employment may be terminated for any non-discriminatory reason without prior warning or consultation. (West's Policy Manu-

al at 34). Since plaintiff began work on October 18, 1998, the term of her probationary employment was not due to expire until January 18, 1999.

On or around January 6, 1999, while plaintiff was still in the probationary stage of her employment, West monitored several telephone calls at plaintiff's station as part of its Quality Assurance Program. (J–Douglas Aff. ¶ 9). Plaintiff was recorded being rude to a caller, failing to read the entire script for the psychic line group, speaking negatively about one of West's clients, giving her own advice to callers, and failing to read "legally required" scripted material. (J–Douglas Aff. ¶ 9). Each of the recorded incidents was a violation of the express terms of West's Policy Manual, although the appropriate disciplinary action for each ranged in severity. After the violations occurred, each separate infraction was recorded in separate performance improvement notices. (J–Douglas Aff. ¶ 4). West's standard policy procedure requires Human Resources personnel to review every performance improvement notice that could result in an employee's termination. Since rudeness to a caller and speaking negatively about a client are grounds for immediate dismissal, (West's Policy Manual at 14–15), the violations were reviewed by plaintiff's supervisor, Laura Richter, and by Ms. J–Douglas.[1] Ms. J–Douglas reviewed not only the reports of the violations, but also listened to the taped recordings of plaintiff's conversations at issue. (Schroeder Letter at 2). Afterward, Ms. J–Douglas approved plaintiff's termination, effective January 14, 1999. All of plaintiff's violations were incorporated into a single performance improvement notice, which was given to plaintiff to sign. (J–Douglas Aff. ¶ 10).

---

1. While Human Resources reviewed plaintiff's violations, she continued to receive calls as a telemarketer for the psychic line group. Her pending performance review notwithstanding, plaintiff was recorded using profanity during a monitored telephone call. Although this infraction is also grounds for immediate dismissal under the explicit terms

of West's Policy Manual for Telemarketing Representatives, (Def.Mot.Summ.J., App. A, Attach. 9 to Ex. 4, at 14 [hereinafter West's Policy Manual] ), since plaintiff had already committed two separate dismissal-worthy violations, this violation was not incorporated into plaintiff's final performance improvement notice. (J–Douglas Aff. ¶ 10).

Following the termination, plaintiff filed a complaint with the Equal Employment Opportunities Commission ("EEOC")[2] and received a right-to-sue letter. Plaintiff, proceeding *pro se*, timely filed a complaint pursuant to 42 U.S.C. § 2000e–2 (1994) ("Title VII").[3] The only active claim before this court alleges religious discrimination in violation of Title VII.[4] Plaintiff claims that (1) she was treated differently than other employees on the basis of her religion; and (2) defendant more reasonably should have accommodated her religious beliefs. Defendant filed a motion for summary judgment on March 8, 2000, with the appropriate notice and instructions for *pro se* litigants. Plaintiff responded to the motion on March 15, 2000. The parties came before the court for oral argument on April 4, 2000, at which time the court took the matter under advisement. The matter is now ripe for review.

## II. Exhaustion of Administrative Remedies

Defendant argues, pursuant to 42 U.S.C. § 2000e–5(c), that this court lacks jurisdiction over the case at bar because plaintiff failed to exhaust her state remedies before filing her complaint in federal court. Specifically, defendant contends that although plaintiff filed a claim with the EEOC, she

failed to file a claim with the applicable state agency, in this case the Virginia Council on Human Rights ("VCHR"), and that failure to do so precludes this court's jurisdiction. For the reasons outlined below, the court disagrees.

Title VII requires that a complainant initiate proceedings with the proper state agency prior to filing a suit in federal court, provided that the state in which the alleged discrimination occurred is a "deferral state." The statute provides that a deferral state is one that has an enforceable law to prohibit discrimination, and a state agency "to grant or seek relief from such discriminatory practice." 42 U.S.C. § 2000e–5(c). More specifically, § 2000e–5(c) provides, in pertinent part, that

> [i]n the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice ... no charge may be filed ... by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminat-

**2.** Plaintiff's complaint filed with the Equal Employment Opportunities Commission ("EEOC") alleged racial discrimination, religious discrimination, and retaliatory discharge based on plaintiff's complaint of discriminatory practices.

**3.** Title VII provides that a complainant must bring a civil action within 90 days after having received a right-to-sue letter. *See* 42 U.S.C. § 2000e–5(f)(1) (1994).

**4.** Plaintiff's complaint also alleges a claim for racial discrimination and a claim that racial intolerance in the workplace created a hostile work environment. However, at the final pretrial conference on April 7, 2000, plaintiff withdrew these claims, and struck all references to racial discrimination from the final pretrial order as a theory of relief under Title VII. (Final Pretrial Conf. Order at 3, 15–16). As such, although the court heard oral argument and evaluated the briefs of both parties

on summary judgment regarding plaintiff's race-based claims, the court considers the claims voluntarily dismissed and does not address them herein.

Furthermore, to the extent that plaintiff alleged a theory of retaliation in her complaint before the EEOC, i.e., that defendant terminated her employment in retaliation for complaining about violations of her civil rights, she has failed to pursue such a claim before this court. Although receiving a right-to-sue letter from the EEOC is a jurisdictional prerequisite to bringing a claim in federal court, *see, e.g., Davis v. North Carolina Dep't of Correction*, 48 F.3d 134, 140 (4th Cir.1995), essentially it outlines the grounds on which a plaintiff may sue. When filed in district court, the complaint frames the grounds that a plaintiff has decided to pursue as a basis for her lawsuit. Even liberally construing plaintiff's *pro se* complaint, she has failed to allege any cause of action for retaliation for consideration by this court.

ed.... If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority. 42 U.S.C. § 2000e–5(c). Although Virginia law does not create a specific cause of action for religious discrimination, the Virginia Human Rights Act ("VHRA") broadly prohibits discriminatory employment practices[5] and vests authority in the VCHR to investigate claims of discrimination and seek relief for claimants.[6] Accordingly, the Fourth Circuit has held that Virginia is a deferral state within the meaning of § 2000e–5(c). *See Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 442 (4th Cir.1998). As such, for this court to exercise jurisdiction over plaintiff's complaint, she must have filed a discrimination claim with the VCHR prior to filing suit in district court. Plaintiff acknowledges that she did not actively pursue a claim with the VCHR, that is, she did not go to an office of the state agency and file a claim separate and distinct from the charge filed with the EEOC. (McIntyre–Handy Dep. at 144). The question facing this court, however, is, absent proof of active filing, what actions are sufficient to discharge plaintiff's burden under § 2000e–5(c).

In addition to creating the substantive rights set forth in Title VII, Congress empowered the EEOC to enforce Title VII by acting on individual complaints. *See* 42 U.S.C. § 2000e–4. The EEOC is explicitly granted the power to "cooperate with and, with their consent, utilize regional, state, local, and other agencies, both public and private, ..." in order to prevent and redress employment discrimination. 42 U.S.C. § 2000e–4(g)(1); *see also* 29 C.F.R. § 1601.13(c) ("[T]he commission shall endeavor to enter into agreements with [state] agencies to establish effective and integrated procedures."). Pursuant to this authority, the EEOC has entered into a worksharing agreement with the VCHR "to provide individuals with an efficient procedure for obtaining redress for their grievances under appropriate State of Virginia and Federal laws." *See* Worksharing Agreement Between Virginia Council on Human Rights and Equal Employment Opportunity Commission For Fiscal Year 1998 at I–B [hereinafter Worksharing Agreement].[7]

---

**5.** The Virginia Human Rights Act ("VHRA") provides:

> It is the policy of the Commonwealth of Virginia [t]o safeguard all individuals within the Commonwealth from unlawful discrimination because of race, color, religion, national original, sex, pregnancy, childbirth or related medical conditions, age, marital status or disability ... in employment.
> Conduct which violates any Virginia or federal statute or regulation governing discrimination on the basis of race, color, religion, national original, sex, pregnancy, childbirth or related medical conditions, age, marital status or disability shall be an unlawful discriminatory practice for the purposes of this chapter.

Va.Code § 2.1–715 to –716.

**6.** The Virginia Commission on Human Rights ("VCHR") is a state administrative agency that is empowered, pursuant to the VHRA, to receive, process, and investigate claims of un-

lawful discrimination. *See* Va.Code § 2.1–714 to –725. The VCHR is likewise authorized to "enter into cooperative worksharing or other agreements with federal agencies or local commissions, including the deferral of complaints of discrimination to federal agencies or local commissions." Va.Code § 2.1–720.5.

**7.** The agencies have extended the 1998 Agreement without substantive change through the Fiscal Year 1999. *See* FY 1999 Extension of Worksharing Agreement. The court notes that neither party to this action actually submitted a copy of the Worksharing Agreement for Fiscal Year 1998 or the 1999 Extension. Although the text of recent district court decisions outline the Worksharing Agreement's substantive provisions, since the document is a matter of public record, the court secured a copy of the Worksharing Agreement, and the applicable extension, for review in connection with this motion. Since plaintiff proceeds *pro*

The Worksharing Agreement, authorized both by Title VII and by Virginia law,[8] defines the contours of the agencies' work relationship, given their common jurisdiction over claims of employment discrimination. In the Worksharing Agreement, each agency designates the other as its agent for the purposes of receiving and drafting charges, including those charges that are "not jurisdictional with the agency that initially receives the charges," to "facilitate the assertion of employment rights." *Id.* at II–B. To that end, each agency is charged with assisting "any person alleging employment discrimination to draft a charge in a manner which will satisfy the requirements of both agencies to the extent of their common jurisdiction." *Id.* at II–C. Moreover, the explicit terms of the Worksharing Agreement provide that the "EEOC's receipt of charges on the [VCHR's] behalf will *automatically initiate the proceedings of both [the] EEOC and the [VCHR] for the purposes of [§ 2000e–5(c) ].*" *Id.* at II–B (emphasis added). For charges originally received by the EEOC and/or to be initially processed by the EEOC, "the [VCHR] waives its right of exclusive jurisdiction to initially process such charges for a period of 60 days for the purposes of allowing the EEOC to proceed immediately with the processing of such charges before the 61st day." *Id.* at III–A.

When one agency initially receives a charge, the Worksharing Agreement provides that it will communicate the charge to the other agency. *See id.* at III–C. The forms typically used to communicate that information are the Charge of Discrimination Form 5 ("Form 5") and a transmittal Form 212 ("Form 212"). Form 5 notifies the other agency of the nature of the charge filed by the particular complainant and Form 212 is used to decide which agency will pursue investigation of the

charge. The intake agency, that is, the agency with which the complainant originally filed the charge, completes and signs the upper half of Form 212, and the bottom half is completed by the other agency. *See Dew v. Nabisco Inc., et al,* Nos. 3:99cv353, 3:99cv117, 3:99cv188, slip op. at 4–5 (E.D.Va. Oct. 4, 1999) (Payne, J.).

Pursuant to the provisions of the Worksharing Agreement as outlined above, the EEOC and the VCHR have established a practice of regularly communicating the fact that charges have been made and of considering the charges to have been "dual filed" with both signatory agencies once they have been filed with one of them. *See Dew* at 5 (E.D.Va. Oct. 4, 1999) (citing Cheryll Patterson, Charge Recipient and Unit Technical Handling at EEOC in Norfolk, Dep. at 24; Sandra Norman, Administrative Staff Specialist with the VCHR, Dep. at 13). The Worksharing Agreement is relied upon by the agencies as the definition of their working relationship and the regular practices each follow when a complainant makes a charge of employment discrimination. *See Morris v. Waste Management of Virginia, Inc.,* 71 F.Supp.2d 537, 539 (E.D.Va.1999); *Smith v. Center Ford, Inc.,* 71 F.Supp.2d 530, 532 (E.D.Va. 1999).

In the case at bar, plaintiff filed a complaint against West with the EEOC. Based on answers given by the plaintiff, the EEOC prepared a Form 5, which plaintiff signed under penalty of perjury. Form 5 briefly sets forth the essential facts of plaintiff's claim and contains the declaration: "I believe I have been discriminated against because of my religion, Atheist, my race, Black, and in retaliation for complaining of discriminatory practices, in violation of Title VII of the Civil Rights Act

---

*se* in this matter, and the Worksharing Agreement and extension are available as a matter of public record, the court does not hold her to the technical requirement of making this submission in response to defendant's motion.

**8.** *See supra* at 724–25 and note 6.

of 1964, as amended, Section 704(a)."[9] Plaintiff's Form 5 contained the preprinted textual statement: "I want this charge filed with both the EEOC and the State or local Agency, if any." Adjacent to that text is a box in which a check mark is to be placed if the response is in the affirmative. The box was not checked on plaintiff's EEOC Form 5. Moreover, neither party has produced Form 212, or any other evidence to show that the EEOC complaint was referred to or received by the VCHR, and that the state agency declined to initially investigate the charge. However, on May 27, 1999, the EEOC issued plaintiff a right-to-sue letter, and the instant claim was timely filed in this court.

In *Dodge v. Philip Morris, Inc.*, No. 99-1968, 1999 WL 162955 (4th Cir. Mar. 15, 1999) (unpublished), the Fourth Circuit held that a plaintiff's failure to include state law claims on her EEOC charge form meant she had not commenced proceedings under state law, and the court, therefore, lacked jurisdiction. However, the court explicitly stated that it was not "deciding whether the filing with the EEOC satisfied the requirement of commencing state proceedings with the VCHR." *Id.* at *2. Since *Dodge*, the district courts of this circuit have attempted to define the scope of a plaintiff's burden of administrative exhaustion pursuant to § 2000e–5(c). The majority of the district courts within the Fourth Circuit have determined that a unitary filing with the EEOC in which the complainant checked the box at the bottom of the standard EEOC charge form requesting that the charge be filed with both the EEOC and the VCHR, satisfies the requirement that plaintiffs "commence proceedings" for § 2000e–5(c) purposes. *See Grimes v. Canadian American Transport., C.A.T., Inc.*, 72 F.Supp.2d 629, 633 (W.D.Va.1999); *Capps v. City of Lynchburg*, 67 F.Supp.2d 589, 594 (W.D.Va.1999); *Harris v. TJX*

*Companies, Inc.*, 60 F.Supp.2d 562, 565 (W.D.Va.1999); *Flippo v. American Home Prods.*, 59 F.Supp.2d 572, 578 (E.D.Va. 1999). *But see Walker v. Electrolux Corp.*, 55 F.Supp.2d 501, 504 (W.D.Va.1999). Most recently, the courts within this district have extended the doctrine and held, in cases where the EEOC claim was actually received by the VCHR, that failure to check the referral box on Form 5 does not strip a federal court of jurisdiction. *See Carter v. Arlington Pub. Sch. Sys.*, 82 F.Supp.2d 561, 566 (E.D.Va.2000); *Morris*, 71 F.Supp.2d at 539; *Smith*, 71 F.Supp.2d at 532 (E.D.Va.1999); *Dew* at 19–21. While failure to check the referral box alone will not strip a federal court of jurisdiction, the question posed by the facts of the instant case is whether this court can properly exercise subject matter jurisdiction in the absence of both an express request for referral via Form 5 and proof that the VCHR actually received the referral. The court finds that it can.

It has long been recognized that public officials are accredited with a presumption of regularity. *See id.* This presumption "supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); *see also Petrelle v. Weirton Steel Corp.*, 953 F.2d 148, 153–154 (4th Cir.1991) (citing *United States v. Arlington*, 669 F.2d 925, 931 (4th Cir.), *cert. denied*, 459 U.S. 801, 103 S.Ct. 23, 74 L.Ed.2d 39 (1982) (presuming regularity of State Department official's act); *E.I. Dupont De Nemours & Co. v. Train*, 541 F.2d 1018, 1032 (4th Cir.1976), *modified by* 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977)). The presumption is sufficient to "sustain the inference" that an agency did "whatever was appropriate" to effectuate

---

9. Complainants do not draft this particular language on a charge form themselves. "The recited text respecting the source of law for a claim is a computer-produced boilerplate statement entered by the EEOC." *See Dew v. Nabisco Inc., et al.*, Nos. 3:99cv353, 3:99cv117, 3:99cv188, slip op. at 5 (E.D.Va. Oct. 4, 1999) (Payne, J.).

an instituted procedure. *See Petrelle*, 953 F.2d at 153–54 (citing *R.H. Stearns Co. v. United States*, 291 U.S. 54, 63, 54 S.Ct. 325, 78 L.Ed. 647 (1934); *Lewis v. United States*, 279 U.S. 63, 73, 49 S.Ct. 257, 73 L.Ed. 615 (1929)). This presumption has been applied to the referral of charges to a state agency under the Age Discrimination in Employment Act. *See Petrelle*, 953 F.2d at 153–54; *Seredinski v. Clifton Precision Prods., Co.*, 776 F.2d 56, 63 n. 11 (3d Cir.1985) (While it was unclear whether the EEOC had referred the charges to the state agency, the court "assumed that [the] EEOC followed regulations and deferred to [the state agency] upon receipt of Seredinski's charge, thus commencing state proceedings.").

 The presumption is likewise applicable in this case. The Worksharing Agreement, which is relied upon by the EEOC and the VCHR to define their working relationship, provides that, when either agency initially receives a new charge, it will communicate the charge to the other. *See* Worksharing Agreement at III–C; *Dew* at 4, 16. Moreover, the express terms of the Worksharing Agreement provide that the agencies themselves consider an action filed with the EEOC on the VCHR's behalf to automatically initiate proceedings with both agencies within the meaning of § 2000e–5(c). *See* Worksharing Agreement at II–A. Representatives of the Norfolk EEOC office, the Richmond EEOC office, and the VCHR have indicted that, pursuant to the Worksharing Agreement, the agencies have established a practice of regularly communicating the fact that charges have been made, and consider the charges to have been "dual filed" and proceedings commenced with

both signatory agencies once they have been filed with one of them. *See Dew* at 5, 16–17. Therefore, this court presumes that the procedures set forth in the Worksharing Agreement and regularly practiced by employees of the EEOC and the VCHR were followed and that plaintiff's claim was referred to the VCHR by the EEOC. Once the presumption of regularity arises, the burden shifts to defendant to show that the charge was not referred. *See Petrelle*, 953 F.2d at 153 (citing *Lewis*, 279 U.S. at 73, 49 S.Ct. 257). Defendant has failed to do so.

In light of the aforementioned authority, plaintiff has, at a threshold level, met her burden under 42 U.S.C. § 2000e–5(c). Neither the failure to check the box on Form 5, nor plaintiff's failure to prove that her claim was actually referred to the VCHR divests this court of jurisdiction.[10] Accordingly, defendant's motion for summary judgment based on plaintiff's failure to exhaust administrative remedies is **DENIED**, and the court proceeds to address defendant's motion for summary judgment on the merits of plaintiff's claim.

### III. Summary Judgment on the Merits

Summary judgment is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990) (en

---

**10.** This conclusion is supported and confirmed by the purpose of Title VII as a "remedial anti-discrimination statute that is designed to be accessible to the layperson." *Carter v. Arlington Pub. Sch. Sys.*, 82 F.Supp.2d 561, 567 (E.D.Va.2000) (citing *Nash v. D.S. Nash Constr. Co.*, 70 F.Supp.2d 639, 644 (W.D.Va.1999)). An unrepresented plaintiff may well not know that both federal and state laws banning discrimination in the

workplace exist. "Given the complexity of the laws in this area, it is unrealistic to expect claimants to cite specific state statutes in their complaints, to check certain boxes, or to go to a particular state agency." *Id.* To require more of a plaintiff would essentially mean that claimants would likely not satisfy Title VII's exhaustion requirement, unless they were either lawyers or lucky. *See id.*

banc), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); *Terry's Floor Fashions, Inc. v. Burlington Indus.,* 763 F.2d 604, 610 (4th Cir.1985). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts through affidavits, depositions, interrogatories or other evidence, illustrating genuine issues for trial. *See* Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Hagan v. McNallen,* 62 F.3d 619, 623–24 (4th Cir.1995). Such facts must be presented in the form of exhibits and sworn affidavits. A mere scintilla of evidence is not sufficient to withstand a motion for summary judgment. Rather, the evidence must be that the jury reasonably could find for the nonmoving party. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Although the court must draw all justifiable inferences in favor of the nonmoving party, *see id.* at 255, 106 S.Ct. 2505, in order to successfully defeat a motion for summary judgment, a non-moving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." *Doyle v. Sentry Ins.,* 877 F.Supp. 1002, 1005 (E.D.Va.1995) (citing *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). While courts must "take special care when considering a summary judgment motion in a discrimination case because motive is often the critical issue," summary judgment is still appropriate if the plaintiff cannot prevail as a matter of law. *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 958–59 (4th Cir. 1996); *see also Demuren v. Old Dominion University,* 33 F.Supp.2d 469, 474 (E.D.Va.1999).

▮ The only claim before the court on summary judgment is whether plaintiff was unlawfully discharged from her employment based on her religion in violation of Title VII.[11] *See* 42 U.S.C. § 2000e–2. The Fourth Circuit recognizes two theories under which an employee may assert a claim for religious discrimination: disparate treatment based on religion and failure to accommodate religious beliefs. *See Chalmers v. Tulon Co. of Richmond,* 101 F.3d 1012, 1017 (4th Cir.1996). Plaintiff attempts to articulate a claim for religious discrimination under both theories. However, for the reasons stated below, plaintiff's evidence fails to raise a genuine issue of material fact of religion-based discrimination under either theory. Accordingly, defendant is entitled to summary judgment on the merits of plaintiff's claim.

### A. Disparate Treatment—Pretext

▮ To prove a claim under the disparate treatment theory, "an employee must demonstrate that the employer treated her differently because of her religious beliefs." *Id.* Accordingly, a plaintiff-employee alleging disparate treatment with respect to her discharge satisfies a prima facie case if she establishes that: (1) her job performance was satisfactory; and (2) that direct or indirect evidence exists to support a reasonable inference of a discriminatory discharge. *See id.* Such proof may consist of evidence that an employer treated a plaintiff more harshly than other employees of a different religion, or of no religion, who engaged in similar conduct. *See id.* The evidentiary burdens under this theory mirror those placed on employees alleging employment discrimination based on race or sex. *See id.* A plaintiff may satisfy her burden of proof on summary judgment by offering either direct or indirect evidence of an intent to discriminate. *See Evans,* 80 F.3d at 958–59. Direct evidence of discrimination is either direct evidence of a stated purpose to discriminate, or circumstantial evidence of sufficient probative force to raise a genuine issue of material fact. *See id.* at 959; *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir.1988). However, because subjective intent and motivation

---

11. *See supra* note 4 and accompanying text.

are so difficult to prove, a plaintiff may also use the burden-shifting framework similar to the one articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to develop an inferential case. *See Gillins v. Berkeley Elec. Co-op., Inc.*, 148 F.3d 413, 415 (4th Cir.1998); *Chalmers*, 101 F.3d at 1017; *Evans*, 80 F.3d at 959.

Under the *McDonnell Douglas* framework, the burden is initially on the plaintiff to establish a prima facie case of discrimination by presenting some evidence showing a connection between her status as a member of a protected class and an adverse employment action. *See Autry v. North Carolina Dep't of Human Resources*, 820 F.2d 1384, 1385 (4th Cir.1987). Plaintiff's burden is not onerous. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the plaintiff establishes a prima facie case, the burden shifts to defendant to demonstrate a non-discriminatory reason for the adverse employment action. *See Chalmers*, 101 F.3d at 1018. A defendant's explanation must be supported by evidence—mere allegations in the pleadings or arguments of counsel will not satisfy defendant's burden. *See Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089.

■ Finally, if the defendant offers a nondiscriminatory explanation, the burden shifts back to plaintiff to show that the defendant's proffered explanation is merely a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. 1817. The Fourth Circuit requires a plaintiff to satisfy a "pretext-plus" standard to carry this burden and survive a motion for summary judgment. Under this standard, a plaintiff must do more than just simply challenge the truthfulness of the defendant's explanations, she must adduce sufficient evidence both that the proffered nondiscriminatory reason is false

and that discrimination was the defendant's actual motivation. *See Vaughan v. Metrahealth Cos.*, 145 F.3d 197, 202 (4th Cir.1998); *see also Gillins*, 148 F.3d at 417. At all times, the ultimate burden of persuasion lies with the employee. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

Plaintiff argues that she is entitled to relief because (1) during her tenure as a West employee her job performance was satisfactory, and (2) her employment was terminated based on her refusal to read telemarketing scripts that she felt conflicted with her beliefs, or non-beliefs, as an atheist.[12] Although the court is not persuaded that plaintiff's evidence gives rise to a prima facie case of disparate treatment, assuming *arguendo*, for the purposes of this motion, that plaintiff has met her initial burden, her claim still fails as a matter of law.

■ West has set forth, through the introduction of clear, specific, admissible, and credible evidence, a non-discriminatory reason for plaintiff's termination—more than satisfying its burden under the *McDonnell Douglas* framework. *See Gillins*, 148 F.3d at 416 ("[U]nder the McDonnell Douglas burden-shifting scheme, a defendant is required to respond to the prima facie case by '*merely articulating*' a nondiscriminatory reason.") (emphasis added). The undisputed facts before this court are as follows. Before plaintiff began work at West, she signed a Statement of Understanding in which she acknowledged, *inter alia*, that: (1) she was responsible for reading the contents of West's Policy Manual which was to serve as a reference guide concerning her employment; and (2) all work-related telephone calls may be monitored, with or without her consent. Plaintiff started her employment in West's direct line group, but after she complained to Ms. J–Douglas about having to say "I'm glad you called"

12. Specifically, plaintiff argues that reference to the words "god-gifted psychics," "god-given gifts," and "spiritual" in West's scripts for

the psychic line group conflicted with her beliefs as an atheist. *See infra* note 22.

when the client involved was religiously-affiliated, her supervisors agreed to accommodate plaintiff by transferring her to the psychic line group. Plaintiff started as a telemarketer for the psychic line group on November 10, 1998, and continued in the group for the rest of her tenure at West.

Almost two months after her transfer, on January 6, 1999, pursuant to West's Quality Assurance Program, at least three calls to plaintiff's station in the psychic line group were monitored. In one call, plaintiff was recorded saying to a customer calling for information regarding the Psychic Reader's Network, "So you want to lie to a Psychic, huh?" (J–Douglas Aff. ¶ 9; Schroeder Letter at 2; Pl. Opp'n Summ.J., Notes Regarding Calls Made Jan. 6, 1999, at 2 [hereinafter Call Notes] ). Moreover, in that same call, although the caller had previously stated her age as twenty years old, plaintiff accused the caller of lying about her age, supposing that she was not yet eighteen. (J–Douglas Aff. ¶ 9; Schroeder Letter at 2; Call Notes at 2). According to the policy manual, "being blatantly rude to a caller (as an example, but not limited to, mocking the caller or being disrespectful, sarcastic, or unprofessional)" is grounds for immediate dismissal. (West's Policy Manual at 14). That same day, on another call, plaintiff was recorded telling a caller that the client

"could care less. It's money for the company." (McIntyre–Handy Dep. at 71–71; Call Notes at 1). In the event that an employee makes "derogatory comments in reference to a product or client serviced by West ... while processing a call," the policy manual is clear that such behavior is also grounds for immediate dismissal. (West's Policy Manual at 15).

Although plaintiff was still within her initial three-month probationary period, during which her employment could be terminated for any non-discriminatory reason without any prior warning or consultation, West's evidence clearly shows that the above two violations were grounds for immediate dismissal under the plain language of West's Policy Manual.[13] The violations were reviewed by plaintiff's supervisor, Laura Richter, and by Ms. J–Douglas of the Human Resources Department.[14] Following the review process, Ms. J–Douglas approved the termination of plaintiff's employment effective January 14, 2000. West maintains that the termination of plaintiff's employment was based on her blatant rudeness to a caller and for speaking about a client in a derogatory manner. (J–Douglas Aff. ¶ 10).[15] Because job performance is widely recognized as a valid non-discriminatory basis for any adverse employment action, *see*

**13.** It is further undisputed that on January 6, 1999, plaintiff also failed to read the script for the psychic line group as required, gave callers her own advice, failed to provide legally required portions of the script to the caller, and engaged in extensive extraneous conversations with callers. While defendant admits that these violations were noted and incorporated into the final performance improvement notice, it maintains that these violations did not form the basis of it's decision to terminate. (J–Douglas Aff. ¶ 10). In particular, the terms of West's *Policy Manual* do not allow for immediate dismissal for script violations, thus West maintains it relied on the rudeness and negative speech about a client to form the basis of its decision to terminate. West's Policy Manual supports this assertion, as it outlines a graduated four-step disciplinary/corrective action policy: documented consultation, written warning, disciplinary probation, and dismissal. However, "management is not required to go through the entire four steps of the corrective procedure. The corrective action procedure may begin at any step appropriate to the seriousness of the employee problem." (West's Policy Manual at 12–13). The script violations that plaintiff argues formed the basis of West's decision to terminate are punishable only by documented consultation, written warning, and disciplinary probation, depending on the severity of the employee's deviation from the script. (West's Policy Manual at 14); *see infra* note 22.

**14.** This review was pursuant to West's standard procedure that requires human resources to review every performance improvement notice that could result in an employee's termination.

**15.** *See supra* note 13.

*Burdine,* 450 U.S. at 258–59, 101 S.Ct. 1089; *Evans,* 80 F.3d at 960; *Young v. Lehman,* 748 F.2d 194, 198 (4th Cir.), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 489 (1985), defendant has met its burden under *McDonnell Douglas,* and plaintiff must present proof that West's explanation is pretextual and that she was the victim of intentional discrimination. *See Evans,* 80 F.3d at 960; *Hughes v. Bedsole,* 48 F.3d 1376, 1384 (4th Cir.), *cert. denied,* 516 U.S. 870, 116 S.Ct. 190, 133 L.Ed.2d 126 (1995).

Plaintiff fails to produce any evidence to show that defendant's articulated reasons for termination are pretextual. Although she *concludes* that defendant's stated reasons are pretextual, and that West's *real* reason for termination was her refusal to read the scripts that she felt conflicted with her beliefs as an atheist, a plaintiff's "own naked opinion, without more," is not enough to create a genuine issue of material fact sufficient to defeat summary judgment. *See Goldberg,* 836 F.2d at 848; *see also Evans,* 80 F.3d at 959; *Demuren,* 33 F.Supp.2d at 479. Furthermore, and more importantly, plaintiff admitted in her deposition in the instant matter both that she understood rudeness to a caller and speaking negatively of West's client were grounds for immediate dismissal, and that she indeed spoke negatively about West's client, telling a caller, the client "could care less. It's money for the company." (McIntyre–Handy Dep. at 71–72). While plaintiff may not *believe* that defendant terminated her for that behavior, the uncontroverted evidence before this court is that plaintiff violated a clearly stated company policy which she knew could result in immediate termination, and that she was, in fact, so terminated. The law simply cannot permit recovery based upon a plaintiff's subjective belief regarding an employer's motivation, where it is clearly contradicted by the objective evidence before the court.[16]

■■■ Hoping to raise the inference of pretext by showing that others outside of her protected class received less harsh treatment for similar violations, *see, e.g., Gillins,* 148 F.3d at 416, plaintiff claims that non-atheist employees who engaged in conduct similar to hers were not terminated. Again, plaintiff's evidence fails to create any genuine issue of material fact to establish pretext. As a threshold matter, the statements plaintiff offers to prove this disparate treatment cannot be considered by this court on summary judgment.[17]

---

**16.** In order to prove discriminatory animus and suggest a strong causal connection between her status as an atheist and West's decision to terminate, plaintiff set forth several allegations in her complaint that this court will not substantively address in connection with the instant motion. In her complaint, plaintiff stated in support of her religious discrimination claim that: "Supervisor David Jerkins threatened [her] with termination after she explained to him that [she] could not read religious scripting because of her beliefs." (Compl.¶ 9). She also alleged that "Coach Vicky Hambuesch singled [her] out in the workplace and told the group that [she] was the only one with a problem with reading religious scripting." (Compl.¶ 9). However, plaintiff has provided no proof to support these statements as required of a non-moving party when faced with summary judgment. Even though she proceeds *pro se* in the instant matter, plaintiff cannot create a genuine issue of material fact sufficient to survive a motion for summary judgment on the strength of unverified, unsubstantiated allegations in the pleadings.

**17.** To establish pretext, plaintiff relies on the documents marked "Telephone Conversation with Deborah Sherrod;" "Telephone Conversation with Jenelle Craggette;" and a letter allegedly signed by Ms. Craggette submitted in connection with her opposition to summary judgment. (Pl. Opp'n Summ.J. Attachs.). None of these documents are verified, and the first two are merely typewritten notes summarizing conversations that plaintiff allegedly had with these two individuals. The letter allegedly signed by Ms. Craggette appears to be written by two different people, although underneath one of the paragraphs is a signature that reads Jenelle Craggette. However, the signature is not verified. At the final pretrial conference, these documents were excluded from trial as hearsay. (Final Pretrial Conf. Order at 5–6). Accordingly, these documents may not be considered by the court on defendant's motion for summary

Moreover, even if the court could consider the statements, they simply do not support plaintiff's allegations. First, plaintiff has put forth no evidence identifying the religious affiliations of the individuals to create any inference of disparate treatment between individuals of different religions. Secondly, plaintiff has not shown that these two individuals engaged in the same behavior in which plaintiff engaged. All the statements indicate is that these individuals deviated from scripted information and were not terminated by West. Plaintiff has provided no proof that either Ms. Craggette or Ms. Sherrod were ever rude to a caller or spoke negatively about a client, or that West had knowledge of such behavior and did not terminate their employment.

Defendant has articulated a legitimate, non-discriminatory reason for plaintiff's termination, and plaintiff has failed to adduce any credible evidence that defendant's explanation was pretextual, much less that its true motivation was discrimination. Therefore, defendant is entitled to summary judgment on plaintiff's disparate treatment claim.

### B. Disparate Treatment—Mixed–Motive

 Because plaintiff does not dispute that she spoke negatively about a client, an infraction that, under the terms of West's Policy Manual, is cause for immediate termination, the best case plaintiff could hope to present is one of mixed-motive—she could attempt to show that religion was a motivating factor in the decision to terminate her employment, even though other, legitimate factors also motivated the decision. *See* 42 U.S.C. § 2000e-2(m). A plaintiff does not have to decide at the outset whether to classify his or her case as a "pretext" or "mixed-motive" case. *See Fuller v. Phipps*, 67 F.3d 1137, 1142 n. 2 (4th Cir.1995). Instead, the decision lies within the discretion of the district court

judgment. *See* Fed.R.Civ.P. 56(e); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir.1991) (evidence submitted in opposition to summary

judge who makes the determination after evaluating the evidence. *See id.* Although neither party addresses the potential for a claim under a mixed-motive theory of discrimination, after reviewing the evidence before the court, the court briefly addresses this potential claim.

 "Employment discrimination law recognizes an important distinction between mixed-motive and pretext cases.... The distinction is critical, because plaintiffs enjoy more favorable standards of liability in mixed-motive cases," especially after the Civil Rights Act of 1991. *Fuller*, 67 F.3d at 1141 (citations omitted); *see* Civil Rights Act of 1991, Pub.L. No. 102–166, § 107(a), 105 Stat. 1071, 1075 (amending 42 U.S.C. § 2000e–2 (1964)). Pretext cases represent the typical disparate treatment action in which the plaintiff seeks to prove that a defendant's proffered non-discriminatory reason for an adverse employment action was, in reality, a pretext for a racially motivated decision. *Fuller*, 67 F.3d at 1141. Throughout the case, though, the plaintiff retains the burden of persuasion. *Id.* (citations omitted). While most discrimination cases will fall within the pretext paradigm, if a plaintiff can present sufficiently direct evidence of discrimination, she qualifies for the more advantageous standard of liability applicable in mixed-motive cases. *Id.* The evidentiary burden that a plaintiff must satisfy in pursuit of a mixed-motive theory requires "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion." *Id.* at 1142 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)). Moreover, "[n]ot all evidence that is probative of discrimination will entitle plaintiff to a [mixed-motive] charge." *Id.* (citing *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 181 (2d Cir.1992)). Otherwise, any plaintiff who is able to establish a

judgment motion must be admissible and based on personal knowledge).

prima facie showing in a pretext case would qualify for a mixed-motive instruction, conflating the two categories of cases and subverting the Supreme Court's effort to distinguish the two theories. *See id.* (citing *Schleiniger v. Des Moines Water Works*, 925 F.2d 1100, 1101 (8th Cir.1991)). The evidence required is evidence "of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller*, 67 F.3d at 1142. Mixed-motive cases are cases not only where the record would support a conclusion that both legitimate and illegitimate factors played a role in the employer's decision, *see Miller v. CIGNA Corp.*, 47 F.3d 586, 597 (3d Cir.1995) (en banc), but where the plaintiff's evidence of discrimination is sufficiently direct to shift the burden of proof to the employer on the issue of whether the same decision would have been made in the absence of the discriminatory animus. To the extent that the court considers plaintiff's discrimination claim under a mixed-motive theory of liability, it fails as a matter of fact and law.

■ Plaintiff's evidence fails to raise a genuine issue of material fact of conduct or statements both that reflect directly West's discriminatory attitude based on plaintiff's atheism and that bear directly on West's decision to terminate her.[18] Although plaintiff argues that West terminated her based on her unwillingness to read the scripts as written, she has presented no evidence other than her own conclusion, speculation, and supposition to support this allegation. The only admissible evidence that may raise the inference that West considered reasons for terminating plaintiff other than her rudeness to a caller and speaking negatively about a client, is the final performance improvement notice detailing plaintiff's infractions of January 6, 1999, and indicating termination as the disciplinary recourse. Next to the phrase "Description of Infraction," was written: "During a monitoring session conducted on 1–6–99, Sonya violated multiple policies including 2 immediate dismissal offenses. She was recorded being rude and disrespectful to a caller, failing to read required scripted information, initiating excessive and extraneous conversation and an unwillingness to be helpful while processing a call. As a result we are issuing a probationary release." (Pl. Opp'n Summ. J., Final Performance Notice (Designated in Final Pretrial Order as Def.Ex. 13)). However, plaintiff's evidence does not establish a causal nexus, direct or indirect, between the script violations on January 6, 1999, and plaintiff's religion. The call monitor's log catalogues the following script violations: (1) not confirming sales several times; (2) not asking additional questions on several calls; (3) not reading the script greeting on one call; and (4) not giving the "800 number." (Call Notes at 2). Even if the court were to assume that each of these script violations contributed to West's decision to terminate, plaintiff has failed to come forth with any evidence that links the script violations for which she was cited on January 6, 1999, and her atheism.

■ Plaintiff also argues that because the call monitor's notes indicate that plaintiff said, "I am atheist but I study other religions," while on the phone with a caller, that creates an illegitimate criteria on which West relied in making its termination decision. (Call Notes at 2). To the extent that the "I am atheist" comment may be considered "extraneous conversation" within the scope of the final performance improvement notice, even if West considered this extraneous conversation in its decision to terminate, such evidence does not illustrate being terminated because of religion. On January 6, 1999, plaintiff engaged in several extraneous conversations with callers, (Call Notes at 2), exhibiting a pattern of extraneous speech that West is not required to tolerate, whether or not religious in content.

18. *See supra* note 16.

West has the right to limit the excessive, extraneous conversations of its employees during work hours. Merely because the extraneous speech may have been about religion does not entitle plaintiff to speak about her religious, or non-religious, tendencies on company time while on the phone with a caller. Title VII gives plaintiff the right not to be discriminated against in employment because of her religion, it does not give her the right to proselytize on company time.

Plaintiff has not put forth direct evidence that West placed substantial negative reliance on her status as an atheist before reaching its decision to terminate her employment. *See Fuller*, 67 F.3d at 1142. Even if West relied on each of the January 6, 1999, infractions in making its decision to terminate, plaintiff's evidence does not create a genuine issue of material fact that doing so would have meant West relied on an illegitimate criterion. As such, the evidence before the court fails to support a mixed-motive theory of religious discrimination.

### C. Failure to Accommodate

■ Title VII requires employers to make reasonable accommodations for the religious observances and beliefs of its employees, if such accommodations can be made without undue hardship on the business. *See* 42 U.S.C. §§ 2000e–2(a)(1), 2000e(j).[19] The Fourth Circuit requires a plaintiff seeking recovery under a religious accommodation theory to show that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the

employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Chalmers*, 101 F.3d at 1019. If plaintiff presents sufficient evidence to satisfy a prima facie case, the burden then shifts to defendant to show that it reasonably attempted to accommodate the plaintiff's needs. *See id.*

■ It is undisputed that as an employee of the direct line group, plaintiff received phone calls for at least two clients that were religiously-affiliated organizations. Because plaintiff felt that "selling religion," and having to listen to callers' testimonials conflicted with her beliefs as an atheist, she informed her supervisors by letter dated November 4, 1998, that she wanted either a transfer to a different line group or the authority to change the wording of the scripts she found offensive. However, there is no evidence that plaintiff was disciplined while a member of the direct line group for failure to read the scripts which were "offensive" to her. Indeed, once plaintiff made her discomfort known to her supervisor, a meeting was scheduled for the very next day to discuss her problem, and she was quickly moved to the psychic line group.[20]

■ A reasonable accommodation is one that does not cause undue hardship to an employer, or does not result in more than a *de minimis* cost to an employer. *See Trans World Airlines, Inc., v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); *Chalmers*, 101 F.3d at 1019. Since, in the direct line group, defendant did not have the capability to reroute the religiously-affiliated calls away

---

19. Title 42 of the United States Code Section 2000e(j) provides, in relevant part:

The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

20. Within five days of plaintiff's first complaint to her supervisor regarding the text of the scripts she was required to read in the direct line group, West transferred plaintiff to the psychic line group. To the extent that plaintiff argues that the five-day wait for her transfer was unreasonable, the court disagrees. Five days to approve a new position with a pay increase, and to arrange for the new training, is not an excessive time period. In fact, it seems relatively brief to the court.

from plaintiff's phone, and could not acquire that capability without incurring significant cost, (Burns Aff. ¶ 3), defendant accommodated plaintiff by agreeing to move her to another line group. At the time of plaintiff's request, neither the financial services group, nor the credit services group had openings. (Burns Aff. ¶ 4). To place plaintiff in one of the two groups would have required West to either overstaff the group or remove from the group another employee who had completed a great deal of training. (Burns Aff. ¶ 5). Imposing on other employees to create an accommodation is not required by Title VII. *See Trans World Airlines*, 432 U.S. at 81, 97 S.Ct. 2264. Transferring plaintiff to the psychic line group was the only reasonable option that would not impose undue hardship on West. (Burns Aff. ¶ 5).

Plaintiff also complains that the language of the psychic line group script conflicted with her beliefs as an atheist, in that it required her to say "god-given gifts" and "spiritual." Even if the court assumes, for the purposes of plaintiff's prima facie case, that merely saying these words conflicted with plaintiff's bona fide beliefs as an atheist, there is no evidence in the record that plaintiff ever voiced her discomfort with the "spiritual" or "god-gifted" language to her employers.[21] Certainly, the law cannot permit recovery by a plaintiff alleging failure to accommodate

without, at a minimum, some indication that plaintiff notified her employer of the need for accommodation. Part of the reason for the advance notice requirement is to "allow the company to avoid or limit any 'injury' an employee's religious conduct may cause." *Chalmers*, 101 F.3d at 1021. Because plaintiff did not produce evidence that she informed her employers that the language conflicted with her beliefs, the court finds that West was not given an opportunity to accommodate her in this regard.[22] Lastly, not only has plaintiff failed to put forth any evidence that she notified her employer of the need for accommodation, but she also has put forth no evidence that she was disciplined for her failure to comply with the conflicting employment requirement. As previously detailed, the clear evidence before this court demonstrates that the termination was not based on plaintiff's script violations, but rather on her rudeness to a caller and her negative comments about West's client.[23] Accordingly, even if West had been notified of plaintiff's discomfort with the psychic script, plaintiff has failed to illustrate a causal nexus between the termination of her employment and her failure to read the script as written.

For the reasons stated above, plaintiff's claim of failure to accommodate her religious beliefs fails as a matter of fact and

---

**21.** Although plaintiff alleged in her complaint that she "expressed that [she] was an atheist and [she] did not believe in spirits or psychics," (Compl. ¶ 9), and stated in her opposition to the instant motion that she "asserted religious [sic] reasons for not reading all the scripting," (Pl. Opp'n Summ.J. at 1), both the complaint and the motion were signed, but unverified. Unlike the evidence submitted to prove that she had given West notice of her discomfort with the client contact in the direct line group, plaintiff submitted no admissible evidence to show that West had notice of her discomfort with the psychic line group scripts. To survive summary judgment, a non-moving party cannot rely on mere allegations in the pleadings, but must set forth specific facts through affidavits or other admissible evidence to illustrate genuine issues

for trial. *See* Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff has failed to meet her burden, and thus the court does not consider her conclusory, unverified statements as probative evidence sufficient to create a genuine issue of material fact.

**22.** Furthermore, to the extent that plaintiff's objections were based on the "god-gifted" language, West had a policy in effect that allowed individuals who objected to the use of the word "god," to simply refer to the psychics as "gifted" instead of "god-gifted." (Aff. of Flora Mason ¶ 2).

**23.** *See supra* Section III.A.

law. Defendant is entitled to summary judgment on this claim.

### IV. Conclusion

For the reasons articulated above, the court **DENIES** defendant's motion for summary judgment based on plaintiff's failure to exhaust administrative remedies, but **GRANTS** defendant's motion for summary judgment on the merits of plaintiff's claims.

Plaintiff is advised that she may appeal from this Opinion and Final Order by forwarding a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia 23510. Said written notice must be received by the Clerk within thirty (30) days from the date of this Opinion and Final Order.

The Clerk is **DIRECTED** to mail a copy of this Opinion and Final Order to plaintiff and counsel for defendant.

IT IS SO ORDERED.