**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-2048**

---

CAROLYN HALL,

       Plaintiff - Appellant,

v.

SHEPPARD PRATT HEALTH SYSTEM, INC.,

       Defendant - Appellee.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. Adam B. Abelson, District Judge.  (1:22-cv-03261-MABA)

---

Argued:  September 9, 2025                        Decided:  October 21, 2025

---

Before DIAZ, Chief Judge, and WYNN and HARRIS, Circuit Judges.

---

Affirmed by published opinion.  Judge Wynn wrote the opinion, in which Chief Judge Diaz and Judge Harris joined.

---

**ARGUED:**  Theresa Dawn Truitt Kraft, WILT TOIKKA KRAFT LLP, Washington, D.C., for Appellant.  Paul D. Burgin, OGLETREE DEAKINS, Baltimore, Maryland, for Appellee. **ON BRIEF:**  Garrick M. Ross, OGLETREE DEAKINS, Baltimore, Maryland, for Appellee.

WYNN, Circuit Judge:

Under Title VII, an employer must provide for a religious accommodation unless doing so would impose an undue hardship on the employer, a standard that the Supreme Court recently clarified in *Groff v. DeJoy*, 600 U.S. 447 (2023).

In this case, Carolyn Hall was terminated from her employment at a hospital after she refused to be vaccinated against COVID-19 during the height of the pandemic. She sued her former employer, alleging that it should have granted her a religious exemption from its vaccine requirement.

Because the district court properly concluded that exempting Hall from this requirement would have jeopardized patient safety and increased the risk of disruptive outbreaks in a sensitive environment, we affirm the district court's grant of summary judgment in favor of the hospital.

I.

A.

On this appeal from an order granting summary judgment, we recite the facts in the light most favorable to Hall, the nonmovant.

Hall served as an Admissions Coordinator for the Center for Eating Disorders at Sheppard Pratt Health System in Maryland. In that role, she was responsible for admitting patients to the unit. Hall would greet patients and their families in the lobby, make sure they completed intake paperwork, and answer any questions they had. This welcome process sometimes included a "long talk," especially if the patient was a minor accompanied by concerned parents. J.A. 192. Given these responsibilities, Hall

2

acknowledged that her job "could not be performed at home 100 percent of the time," J.A. 210–11, although Sheppard Pratt had previously allowed her to work remotely on a temporary basis when she contracted COVID-19. Hall also shared a small office with another employee and regularly interacted with additional Sheppard Pratt employees.

B.

In response to the ongoing COVID-19 pandemic, Sheppard Pratt established protocols to protect patients and staff, relying on guidance from the CDC and the Maryland Department of Health. All employees, regardless of vaccination status, were required to wear masks. A positive COVID-19 test from a patient would trigger additional protocols. These outbreak protocols included an isolation procedure, which required Sheppard Pratt to hire more expensive temporary staff to avoid having the same staff interact with patients who had tested positive and then with other patients who had not. Staff working with patients who tested positive needed to wear additional personal protective equipment. Sheppard Pratt also suspended communal patient activities during an outbreak, which disrupted treatment.

Sheppard Pratt was especially attuned to preventing the transmission of COVID-19 in the Center for Eating Disorders. Due to their eating disorders, patients in this unit were medically vulnerable, faced high risks of mortality, and often came to the unit after long periods of hospitalization. Because patients with eating disorders often present with other medical issues, including mental health disorders, malnourishment, and cardiac conditions, these patients were particularly at risk from the effects of COVID-19.

3

Additionally, the treatment program in that unit required numerous instances of close contact between patients and staff. For example, patients ate meals with clinicians present so that the clinicians could provide treatment as to patients' eating habits, and patients could not use the restroom without a staff member present to ensure that the patient did not purge. The treatment program in the Center also placed "extreme importance" on "human interaction and group programming," which were interrupted when a patient in the unit tested positive for COVID-19. J.A. 53–54.

Despite its protocols, between September 30, 2020, and November 12, 2021, Sheppard Pratt experienced twenty-two COVID-19 outbreaks, each lasting between 10 and 38 days.

In August 2021, COVID-19 cases and hospitalizations in Maryland were surging, prompting the Maryland Secretary of Health to issue a directive requiring all employees of healthcare facilities like Sheppard Pratt to be vaccinated against COVID-19 by September 1, 2021. In response, Sheppard Pratt announced that all employees needed to receive their first dose of the vaccine by September 1, 2021, and it directed employees to submit requests for medical or religious exemptions as necessary.

Under its policy, Sheppard Pratt granted religious exemptions "based on a sincerely held religious belief." J.A. 73. The policy required the staff member to submit a request form specifying their religious objection and sometimes required the staff member to submit supporting documentation. Sheppard Pratt would then "consider each request on a case-by-case basis" and might deny the request if it "determine[d] that the risk posed by an

4

unvaccinated staff member [could not] be mitigated and/or constitute[d] an 'undue hardship' under state and federal law." *Id.*

When evaluating each religious exemption request, Sheppard Pratt Vice President of Human Resources Karen Robertson-Keck would speak with the employee's manager to discuss job duties and explore whether the job could be performed without in-person contact. Robertson-Keck also met with the employee requesting an exemption to discuss proposed accommodations. If an employee's job could not be accommodated remotely, Robertson-Keck would explore with the employee whether they might be qualified for another open position that could be performed remotely. If an individual's religious exemption was not granted and they refused to be vaccinated, their employment was terminated, but they remained eligible for rehire. In all, over two hundred Sheppard Pratt employees requested religious exemptions, and two dozen were approved.

Sheppard Pratt followed a different process for medical exemptions. Employees with medical contraindications could request a medical exemption by submitting a Medical Exemption Form, which was then reviewed by a third-party doctor. If approved, employees with medical exemptions who could not work remotely were required to wear masks and test for COVID-19 weekly. This accommodation was not offered to those requesting a religious exemption. In all, about one hundred Sheppard Pratt employees requested medical exemptions, and a little over half were approved.

C.

Hall submitted a request for a religious exemption on August 30, 2021, supported by a letter from her pastor. Per Sheppard Pratt's religious-accommodation procedures,

5

Robertson-Keck first met with Hall's supervisor to assess whether Hall's role could be performed without in-person interaction. She then met with Hall, her supervisor, and the Director of Employee Relations. Sheppard Pratt ultimately determined that, given her role, Hall's requested exemption could not be accommodated. Robertson-Keck told Hall she could apply for other positions that she would be able to perform remotely without being vaccinated, but Hall never did so. Sheppard Pratt terminated Hall effective November 12, 2021.

Hall filed a Charge of Discrimination with the EEOC and received a Right to Sue letter. She filed suit in federal court, alleging violations of Title VII of the Civil Rights Act of 1964—specifically, that Sheppard Pratt had discriminated against her because of her religious beliefs.

Sheppard Pratt moved for summary judgment, and the district court granted the motion. *Hall v. Sheppard Pratt Health Sys., Inc.*, 749 F. Supp. 3d 532, 550 (D. Md. 2024). Hall timely appealed.

## II.

We review the district court's grant of summary judgment de novo, "using the same standard applied by the district court." *Brooks v. Johnson*, 924 F.3d 104, 111 (4th Cir. 2019) (quoting *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)). "In doing so, we recognize that a court should grant summary judgment only if, taking the facts in the best light for the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Id.* (cleaned up).

6

III.

"Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer 'to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . religion.'" *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 470 (4th Cir. 2025) (quoting 42 U.S.C. § 2000e-2(a)(1)). Employees may sue under Title VII using either a "disparate treatment" or "failure to accommodate" theory, *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996), but Hall presses only a failure-to-accommodate claim on appeal.[1]

To assess a claim that an employer failed to accommodate an employee's religion in violation of Title VII, courts employ a burden-shifting framework. First, the plaintiff must establish a prima facie claim. *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (citing *Chalmers*, 101 F.3d at 1019) (listing requirements). Second, if the employee successfully establishes her prima facie case, "the burden then shifts to the employer to show that it could not reasonably accommodate the plaintiff's religious needs without undue hardship." *Id.* (quoting *Chalmers*, 101 F.3d at 1019) (cleaned up).

Sheppard Pratt concedes that Hall established a prima facie case. Therefore, the only question before this Court is whether Sheppard Pratt successfully demonstrated that

---

[1] The district court struggled to understand whether Hall was also bringing a separate disparate-treatment claim under Title VII but nevertheless granted summary judgment to Sheppard Pratt on that claim. *Hall*, 749 F. Supp. 3d at 548–50. Hall does not discuss this matter in her opening brief, so we do not address it here. *See Stokes v. Stirling*, 64 F.4th 131, 137 (4th Cir. 2023).

7

accommodating Hall's requested exemption from the vaccine mandate would cause it undue hardship, entitling it to summary judgment. We agree with the district court that it did.

We first define undue hardship under Title VII, then apply that standard to Hall's exemption request.

A.

Under Title VII, an employer need not grant a religious accommodation if doing so would create an "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). The statute does not define "undue hardship," but the Supreme Court has fleshed out the term's meaning.

In *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977), the Supreme Court described the undue hardship standard in several different ways. In the ensuing years, many lower courts—including this one—coalesced around an understanding of *Hardison* that read one line from that opinion as setting the standard, interpreting "'undue hardship' to mean any effort or cost that is 'more than . . . *de minimis*.'" *Groff*, 600 U.S. at 454 (citing *Hardison*, 432 U.S. at 84); *see, e.g.*, *Firestone Fibers*, 515 F.3d at 312 (applying the more-than-de-minimis standard in this Court).

Recently, however, in *Groff v. DeJoy*, the Supreme Court "clarified" that lower courts had misunderstood *Hardison*. *Groff*, 600 U.S. at 473. Relying on "costs and expenditures that are . . . 'de minimis,' which is to say, so 'very small or trifling' that . . . they are not even worth noticing," is far too weak a standard given the statute's reference to "undue hardship." *Id.* at 464 (quoting Black's Law Dictionary 388 (5th ed. 1979)).

8

Instead, under the correct standard, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.* at 470. In evaluating whether an employer has satisfied this test, courts must "take[] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost" of the employer. *Id.* at 470–71 (cleaned up). An employer puts its strongest foot forward when it considers not only the employee's suggested accommodation but also other potential accommodations. *Id.* at 473.

At the same time, *Groff* specifically declined to adopt the more stringent definition of undue hardship from the Americans with Disabilities Act ("ADA"), which requires employers to show a "significant difficulty or expense" to deny a medical accommodation. *Id.* at 471. This means that employers can more easily show undue hardship when considering religious-accommodation requests under Title VII than when considering medical-accommodation requests under the ADA.

Importantly, because *Groff* clarified *Hardison* rather than overruling it, *Hardison* and lower court cases applying it remain valid to the extent they do not conflict with *Groff*. Relevant here, *Hardison* established that religious accommodations under Title VII need not be viewed in isolation. Courts may, and should, look to the undue hardship a particular religious accommodation would have in the aggregate if granted to all similarly situated employees. *See Hardison*, 432 U.S. at 84 n.15 (chiding the dissent for failing to "take account of the likelihood that a company . . . may have many employees whose religious observances" require a similar accommodation); *Jordan v. N.C. Nat'l Bank*, 565 F.2d 72,

9

76 (4th Cir. 1977) (noting a grant of a particular accommodation "would obligate the bank to provide it for all of its employees and entail extra expense"), *overruled on other grounds by E.E.O.C. v. Ithaca Indus., Inc.*, 849 F.2d 116, 119 n.3 (4th Cir. 1988).

Additionally, in accordance with *Groff*'s command that courts consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact," 600 U.S. at 470, we emphasize that undue hardship can come from "[b]oth economic and non-economic costs" that the employer would incur if it granted the religious accommodation. *Webb v. City of Philadelphia*, 562 F.3d 256, 260 (3d Cir. 2009). For example, *Groff* confirmed that reworking schedules in contradiction to a bona fide seniority system was an undue hardship. 600 U.S. at 462. And we agree with other circuits that have concluded, after *Groff*, that non-economic costs can also include threats to the health and safety of employees and the people they serve. *See Petersen v. Snohomish Reg'l Fire & Rescue*, 150 F.4th 1211, 1220 (9th Cir. 2025); *cf. Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 91 (1st Cir. 2025).

We find particularly helpful the Ninth Circuit's recent analysis in *Petersen v. Snohomish Regional Fire & Rescue*. In that case, firefighters and paramedics requested religious exemptions to the COVID-19 vaccine mandate. The Ninth Circuit concluded that the employer would have incurred "significant health and safety costs by allowing unvaccinated firefighters to continue working, even with accommodations." *Petersen*, 150 F.4th at 1220. The court emphasized that the employer needed the vaccine mandate "to ensure employee and public safety," especially for a workforce that served "persons in the public needing emergency, even life-saving, services." *Id.* Other lower courts have agreed

10

that the undue hardship of having unvaccinated employees is particularly acute in a health care setting, where "the employer's business involves the protection of lives." *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1157 (D. Or. 2024) (quoting *Jean-Pierre v. Naples Cmty. Hosp., Inc.*, 817 F. App'x 822, 828 (11th Cir. 2020) (per curiam)).

B.

With this clarified standard in mind, we turn to whether granting Hall a religious exemption would have constituted an undue hardship for Sheppard Pratt. Viewing the evidence in the light most favorable to Hall, we agree with the district court that Sheppard Pratt satisfied its burden to show that it would have.

First and foremost, Sheppard Pratt put on undisputed evidence that allowing Hall to remain unvaccinated posed an unacceptably high risk to patient safety. As her Complaint makes clear, Hall did not dispute the efficacy of the COVID-19 vaccine, nor its ability to slow transmission of the virus.

And yet, the record is clear that Hall's position required her to interact with medically compromised patients. Sheppard Pratt understandably did not want to risk exposure of those patients to the dangerous effects of COVID-19, and contemporaneous evidence showed that vaccines were more effective in preventing transmission than masking and testing weekly. *Cf. Rodrique*, 126 F.4th at 91 ("Because the record demonstrates that [the employer] relied 'on the objective, scientific information available to [it],' with particular attention to 'the views of public health authorities,' we hold that it acted reasonably when it determined that vaccinated employees are less likely to transmit

11

COVID-19 than unvaccinated employees." (quoting *Bragdon v Abbott*, 524 U.S. 624, 649–50 (1998))).

Sheppard Pratt also put forth undisputed evidence that allowing Hall and the hundreds of others who requested religious exemptions to remain unvaccinated would have increased the risk of a COVID-19 outbreak, which triggered lockdown procedures. Those lockdown procedures were detrimental to patients. For example, during lockdowns, patients lost access to sorely needed social time, leading to social isolation that is especially harmful to patients with eating disorders. The procedures also caused direct economic harm to Sheppard Pratt because the Center for Eating Disorders would temporarily stop admitting new patients.

Hall's refusal to be vaccinated put her fellow coworkers at risk of contracting the virus, as well. Courts have found that, even post-*Groff*, such a safety risk to fellow employees is independently a cognizable undue hardship. *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1136 (C.D. Cal. 2023), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025); *see also Petersen*, 150 F.4th at 1220 (9th Cir. 2025 (noting "firefighters work in group settings, interfacing constantly with coworkers and the public," such that allowing workers to be unvaccinated was a hardship on the fire and rescue team's "own workforce"). But Sheppard Pratt also suffered direct financial harm when it was forced to replace ill workers with more expensive temporary hires at a time when health care worker shortages were already particularly acute.

Sheppard Pratt also considered alternative arrangements. It considered whether Hall's position could be performed remotely and determined that it could not, a conclusion

12

with which Hall herself agreed.[2] It even offered to allow Hall to apply to other positions within the hospital system, an invitation Hall declined.

Hall argues that Sheppard Pratt should instead have offered her the same accommodation it offered to those requesting medical exemptions under the ADA: masking and weekly testing. But Sheppard Pratt considered this alternative and put forth undisputed evidence that these methods were less effective than vaccination at preventing COVID-19 transmission.

As discussed, the law does not require Sheppard Pratt to treat religious and medical exemptions the same. *Compare* 42 U.S.C. § 12111(10)(A) (defining "undue hardship" under the ADA as "an action requiring significant difficulty or expense"), *with Groff*, 600 U.S. at 470 (holding that "undue hardship" under Title VII means that the "accommodation would result in substantial increased costs in relation to the conduct of its particular business"). That diverging standard is why an employer like Sheppard Pratt may deny a religious accommodation request even if the employer has a history of granting that same request as a medical accommodation. Here, it is enough that Sheppard Pratt put forth undisputed evidence that granting Hall a religious exemption would have resulted in the "substantial increased costs" that would result from outbreaks in the hospital, replacement

---

[2] For the first time on appeal, Hall also argues that Sheppard Pratt should have considered erecting plexiglass in the admissions area to accommodate her. We decline to consider this unpreserved argument. But even if we did, Hall put forth no evidence that plexiglass would have slowed transmission to patients, nor would it address the independent risk to other employees who would interact with Hall when she was not behind plexiglass.

13

of ill employees with higher-cost temporary employees, and acute threats to the physical safety of Sheppard Pratt's staff and patients.

It is likely that granting even Hall's single religious exemption would have constituted an undue hardship for the hospital system. But we need not reach that question because Sheppard Pratt also rightly considered the effect of granting not just Hall's request but also those of the significant number of other employees requesting a religious exemption across the hospital system. *See Hardison*, 432 U.S. at 84 n.15. Allowing over two hundred religious-exemption claimants to remain unvaccinated would have unacceptably increased the risk of COVID-19 transmissions and outbreaks.

In all, on this record, considering the "practical impact" of granting Hall's request "in light of the nature" of Sheppard Pratt's business, *Groff*, 600 U.S. at 470–71, the hospital system easily demonstrated the requisite undue hardship necessary to deny Hall's religious accommodation request under Title VII. The district court did not err in granting Sheppard Pratt summary judgment.

## IV.

For the foregoing reasons, the district court's judgment is

*AFFIRMED.*

14